## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| EMBARQ RETIREE MEDICAL PLAN<br>5454 West 110th Street<br>Overland Park, Kansas 66211; and | : <br> : <br> : | |
| | : | |
| RANDALL T. PARKER, in his capacity as Administrator<br>of the Embarq Retiree Medical Plan<br>5454 West 110th Street<br>Overland Park, Kansas 66211, | : <br> : <br> : <br> : | Civil Action No. |
| | : | **FILED: JULY 16, 2008** |
| Plaintiffs, | : | **08CV4045** |
| **v.** | : | **JUDGE HART** |
| KARL BEROLZHEIMER<br>4311 Galax Trail<br>Greensboro, North Carolina 27410; | : <br> : <br> : | **MAGISTRATE JUDGE COX**<br><br>**AEE** |
| | : | |
| DAVID A. BOHMER<br>1001 Crescent<br>Greencastle, Indiana; | : <br> : <br> : | |
| | : | |
| J. THOMAS BROWN<br>525 Susan Constant Drive<br>Virginia Beach, Virginia 23451; | : <br> : <br> : | |
| | : | |
| JAMES J. KROPID<br>50 Innisbrook Avenue<br>Las Vegas, Nevada 89113; | : <br> : <br> : | |
| | : | |
| WILLIAM J. LAGGETT<br>4731 Bonita Bay Boulevard, No. 1103<br>Bonita Springs, Florida 34134-6713; | : <br> : <br> : | |
| | : | |
| JANET A. LANG<br>530 North Lake Shore Drive, Apt. 2105<br>Chicago, Illinois 60611-7434; | : <br> : <br> : | |
| | : | |
| SAMUEL E. LEFTWICH<br>4201 Trillium Lane<br>Greensboro, North Carolina 27410; | : <br> : <br> : | |
| | : | |
| JAMES A. LOVELL, JR.<br>915 South Waukegan Road<br>Lake Forest, Illinois 60045; | : <br> : <br> : | |

:
EDWARD W. MULLINIX, JR.                              :
8166 Hollyridge Road                                 :
Jacksonville, Florida 32256-7104;                    :
:
W. J. NESBIT, JR.                                    :
3385 Loch Brae Lane                                  :
Charlottesville, Virginia 22901;                     :
:
JAMES D. OGG                                         :
8903 Poindexter Road                                 :
Louisa, Virginia 23093;                              :
:
LYLE C. ROBERTS                                      :
27340 Big Springs Ranch Road                         :
Hemet, California 92544;                             :
:
J. STEPHEN VANDERWOUDE                               :
510 Meadowmount Village Circle                       :
Chapel Hill, North Carolina 27517;                   :
:
RICHARD VANDERWOUDE                                  :
616 Yosemite Avenue, No. 101                         :
Naperville, Illinois 60563; and                      :
:
PAUL G. YOVOVICH                                     :
[c/o Lake Capital]                                   :
676 North Michigan Avenue, Suite 3900                :
Chicago, Illinois 60611,                             :
Defendants.                                          :
_____:

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Embarq Retiree Medical Plan ("Plan"); and Randall T. Parker, in his capacity

as Administrator of the Plan ("Plan Administrator")(collectively, "Plaintiffs"), by and through

their undersigned counsel, hereby bring the following Complaint against Defendants Karl

Berolzheimer; David A. Bohmer; J. Thomas Brown; James J. Kropid; William J. Laggett; Janet

A. Lang; Samuel E. Leftwich; James A. Lovell; Edward W. Mullinix, Jr.; W. J. Nesbit, Jr.;

James D. Ogg; Lyle C. Roberts; J. Stephen Vanderwoude; Richard Vanderwoude; and Paul G.

Yovovich (collectively, "Defendants"), seeking a declaratory judgment as well as preliminary and permanent injunctive relief, and alleging as follows:

## I.    PRELIMINARY STATEMENT

1.    Plaintiffs request that this Court enter a declaratory judgment as well as a preliminary and permanent injunction that enjoins an arbitration which was initiated by the Defendants.  *See* Exhibit A, Defendants' Statement of Claim before the American Arbitration Association (the "AAA").  Although Defendants have asserted claims in arbitration against Embarq Communications, Inc. ("Embarq") and Sprint Nextel Corporation ("Sprint"), Defendants have requested that the arbitrator grant each of them welfare benefits under the Plan, and their claims would require the arbitrator to interpret the terms of the Plan itself.  The AAA arbitrator, however, has no jurisdiction or legal authority to resolve any alleged dispute between Defendants and the Plan and/or the Plan Administrator, or to award any of the Defendants benefits under the Plan.

## II.    JURISDICTION AND VENUE

2.    This Court has jurisdiction over this matter pursuant to Sections 502(a) and (e) of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1132(a), (e) ("ERISA").

3.    Venue is proper in this Court pursuant to Section 502 (e)(2) of ERISA, 29 U.S.C. § 1132(e)(2); and 28 U.S.C. § 1391(b), because the Plan is administered in part in this jurisdiction and because the Defendants have commenced the arbitration in this jurisdiction.

## III.    PARTIES

4.    Plaintiff Plan is a single-employer "employee welfare benefit plan" within the meaning of Sections 3(1), (3) and (41) of ERISA, 29 U.S.C. § 1002(1), (3) and (41).  The Plan is

administered in Overland Park, Kansas, where the sponsor of the Plan, Embarq Corporation, maintains its corporate headquarters.

5.    Plaintiff Randall T. Parker is the "Administrator" of the Plan within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. § 1002(16)(A), and the named fiduciary of the Plan pursuant to Section 402 of ERISA, 29 U.S.C. § 1102.

6.    Defendant Karl Berolzheimer is a former employee of Centel Corporation ("Centel") who, upon information and belief, resides in Greensboro, North Carolina.  Mr. Berolzheimer claims an entitlement to certain benefits under the terms of the Plan.

7.    Defendant David A. Bohmer is a former employee of Centel who, upon information and belief, resides in Greencastle, Indiana.  Mr. Bohmer claims an entitlement to certain benefits under the terms of the Plan.

8.    Defendant J. Thomas Brown is a former employee of Centel who, upon information and belief, resides in Virginia Beach, Virginia.  Mr. Brown claims an entitlement to certain benefits under the terms of the Plan.

9.    Defendant James J. Kropid is a former employee of Centel who, upon information and belief, resides in Las Vegas, Nevada.  Mr. Kropid claims an entitlement to certain benefits under the terms of the Plan.

11.    Defendant William J. Laggett is a former employee of Centel who, upon information and belief, resides in Bonita Springs, Florida.  Mr. Laggett claims an entitlement to certain benefits under the terms of the Plan.

12.    Defendant Janet A. Lang is a former employee of Centel who, upon information and belief, resides in Chicago, Illinois.  Ms. Lang claims an entitlement to certain benefits under the terms of the Plan.

13.     Defendant Samuel E. Leftwich is a former employee of Centel who, upon information and belief, resides in Greensboro, North Carolina.  Mr. Leftwich claims an entitlement to certain benefits under the terms of the Plan.

14.     Defendant James A. Lovell is a former employee of Centel who, upon information and belief, resides in Lake Forest, Illinois.  Mr. Lovell claims an entitlement to certain benefits under the terms of the Plan.

15.     Defendant Edward W. Mullinix, Jr. is a former employee of Centel who, upon information and belief, resides in Jacksonville, Florida.  Mr. Mullinix claims an entitlement to certain benefits under the terms of the Plan.

16.     Defendant W. J. Nesbit, Jr. is a former employee of Centel who, upon information and belief, resides in Charlottesville, Virginia.  Mr. Nesbit claims an entitlement to certain benefits under the terms of the Plan.

17.     Defendant James D. Ogg is a former employee of Centel who, upon information and belief, resides in Louisa, Virginia.  Mr. Ogg claims an entitlement to certain benefits under the terms of the Plan.

18.     Defendant Lyle C. Roberts is a former employee of Centel who, upon information and belief, resides in Hemet, California.  Mr. Roberts claims an entitlement to certain benefits under the terms of the Plan.

19.     Defendant J. Stephen Vanderwoude is a former employee of Centel who, upon information and belief, resides in Chapel Hill, North Carolina.  Mr. Vanderwoude claims an entitlement to certain benefits under the terms of the Plan.

20.     Defendant Richard Vanderwoude is a former employee of Centel who, upon information and belief, resides in Naperville, Illinois.  Mr. Vanderwoude claims an entitlement to certain benefits under the terms of the Plan.

21.     Defendant Paul G. Yovovich is a former employee of Centel who, upon information and belief, resides in Chicago, Illinois.  Mr. Yovovich claims an entitlement to certain benefits under the terms of the Plan.

## IV.     COMMON FACTS

22.     In August 1988, Defendant Berolzheimer was signatory to an Executive Termination Agreement ("ETA"), a true and correct copy of which is attached as Exhibit B. Defendants have contended in their aforementioned arbitration claim that each of them, with the exception of Defendant Lovell, executed an ETA that was materially similar to the ETA that Berolzheimer executed.

23.     Berolzheimer's ETA provided that "the Company shall maintain in full force and effect, for [Defendant]'s continued benefit from the Notice Date through the Date of Termination and thereafter for a period of three years after the Date of Termination all life insurance, dental, health and accident, and disability plans, programs or arrangements in which [Defendant] was entitled to participate immediately prior to the [date in which a Change in Control of the Company occurs], to the same extent as if [Defendant] continued to be an employee of the Company during the three year period following the Date of Termination[.]"  *Id*. at paragraph 4(g)(emphasis added).  Paragraph 4(g) further stated that if Defendant's continued participation in the "plans, programs or arrangements" is not possible, then "the Company shall arrange to provide [Defendant] with substantially the same benefits; provided that dental and health and

accident benefits shall be reduced or offset to the extent they are replaced by substantially similar benefits provided by a new employer." *Id*.

24.    Berolzheimer's ETA also states: "at the expiration of the three year period after [Defendant's] Date of Termination (or on [Defendant]'s normal retirement date if it occurs during such period), the Company shall provide [Defendant] with the same life insurance and health and accident coverage to which [Defendant] would be entitled if [Defendant] had retired on the Date of Termination with fifteen years [of] service." *Id*. at paragraph 4(h).  (emphasis added).

25.    Once the three year limitation in paragraph 4(g) of the ETA was reached, the ETA did not set forth any particular level of benefits, but merely entitled Berolzheimer to be treated as if he had fifteen years of service when he retired for purposes of determining his eligibility to receive certain welfare benefits from the Plan.

26.    Berolzheimer's ETA further states that "[a]ny dispute or controversy arising under or in connection with this Agreement shall be settled exclusively by arbitration in Chicago, Illinois in accordance with the rules of the American Arbitration Association then in effect." *See* Exhibit B, at paragraph 11.

27.    Upon information and belief, Defendant Lovell does not have an ETA and does not have any other agreement with Plaintiffs, or any party named as a respondent in the Arbitration, to arbitrate any disputes.

28.    Before 1994, the Centel Corporation Group Welfare Plan (the "CenCare Plan"), a predecessor to the Plan, provided that retirees with fifteen years of service were eligible for certain welfare benefits, including retiree medical benefits at no cost to the retiree.

29.     At all relevant times, each of the Defendants has been provided with all of the benefits under the Plan to which retirees with fifteen years of service under the predecessor CenCare Plan were entitled.

30.     The Summary Plan Description in effect at the time of Defendant's execution of the ETA stated: "Centel expects to continue the Benefit Plan indefinitely, but we necessarily *reserve the right to modify or discontinue it at any time*. Such action would modify or terminate any coverage in effect at such time for active or retired employees." *See* Exhibit C, Centel Corporation Group Welfare Plan Summary Plan Description ("CenCare SPD"), at pp. 88 and 89 (emphasis added).

31.     Likewise, Article VIII of the Plan presently states: "[Embarq] shall have the sole right to alter, amend or terminate this Plan in whole or in part at any time it determines to be appropriate. [Embarq] shall act through its Board or through any party properly authorized to so act by a Board resolution." *See* Exhibit D, Embarq Retiree Medical Plan, at Art. VIII.

32.     No term of the Plan affords any employee or retiree any vested rights to medical or other benefits that are not subject to amendment or alteration.

33.     On June 27, 2007, the Plan was amended to provide that, effective as of January 1, 2008, the Plan would no longer provide retiree medical benefits for Medicare-eligible retirees and Medicare-eligible dependants, and the maximum amount of basic life insurance coverage for retirees would be capped at $10,000. Notice of this amendment was sent to each of the Defendants on or about July 26, 2007. A true and correct copy of the Notice is attached as Exhibit E.

34.     Presently, each of the Defendants is still being treated as if he retired with fifteen years of service, consistent with the terms of the ETA.  The benefits provided to Defendants, however, are determined pursuant to the Plan amendment that was adopted in June 2007.

35.     Defendants claim in the Arbitration that they are entitled to retiree medical and life insurance benefits under the terms of the Plan before it was amended in June 2007, without regard to the amendment.  *See* Exhibit A.  That is, Defendants contend in the arbitration that the amendment does not apply to them.

36.     Defendants Berolzheimer, Lovell and Ogg filed claims for benefits with the Plan Administrator seeking benefits under the Plan and challenging the validity of the Plan amendment.  Those internal, administrative claims and appeals were and have been processed in accordance with requirements set forth by the United States Department of Labor and in the Plan document.

37.     Article VI of the Plan provides that the Plan Administrator "shall have the sole discretion to make decisions and take any action with respect to questions arising in connection with the Plan, including but not limited to the construction and interpretation of the Plan and the determination of eligibility for and the amount and/or definition of Benefits under the Plan."  *See* Exhibit D, at Art. VI, Section 6.3.

## COUNT I

38.     Plaintiffs hereby incorporate by reference and reallege the allegations of Paragraphs 1 through 37 of the Complaint, as if fully set forth herein.

39.     Any and all retiree benefits which Defendants have been receiving and to which they may be eligible are conferred by the Plan, as interpreted and administered by the Plan Administrator.

40.     Neither the Plan nor the Plan Administrator has agreed to arbitrate any disputes with any Defendant regarding any Defendant's entitlement to benefits under the Plan.

41.     Nevertheless, Defendants filed the AAA Arbitration seeking a declaration that they are entitled to retiree medical and life insurance benefits under the terms of the Plan as if the Plan had not been amended.

42.     An actual controversy exists between the parties, as evidenced by the Defendants' Statement of Claim and request for arbitration.

43.     The claims that Defendants asserted in the AAA Arbitration are not arbitrable and do not fall within the arbitration provision of Defendants' ETAs because the ETAs do not promise or confer any of the retiree benefits that Defendants seek.  On the contrary, the ETAs provide for the eligibility of Defendants to participate in the Plan as if they had accumulated fifteen years of service prior to their terminations of employment.  The determination of what benefits any Defendant is entitled to receive is a question for the Plan Administrator under the Plan, and ultimately for a Court in reviewing any final decision of the Plan Administrator.

44.     Resolution of this controversy requires a determination by this Court as to whether the dispute that Defendants are trying to press in the AAA Arbitration is subject to arbitration.

WHEREFORE, the Plaintiffs pray:

(1)     For a declaration that Plaintiffs are not bound to arbitrate any of the disputes with Defendants regarding claims for retiree medical or life insurance benefits, and that any claim by any Defendant seeking benefits under the Plan, challenging the validity of the Plan amendment, or challenging any interpretation of the Plan or their rights to benefits under the Plan is not arbitrable;

(2)　　For an Order preliminarily and permanently enjoining Defendants from arbitrating, or seeking to arbitrate, any claim for retiree benefits from the Respondents in the AAA arbitration or in any related proceedings; and

(3)　　For such further legal or equitable relief as the Court may deem equitable and/or appropriate, or to which Plaintiffs may be entitled.

Respectfully submitted,

EMBARQ RETIREE MEDICAL PLAN

RANDALL T. PARKER, IN HIS
CAPACITY AS ADMINISTRATOR OF
THE EMBARQ RETIREE MEDICAL PLAN

By:　/s Jeremy P. Blumenfeld
　　　By Their Attorneys

Sari M. Alamuddin
Gregory P. Abrams
Morgan, Lewis & Bockius LLP
77 West Wacker Drive
Chicago, IL  60601
Telephone: 312.324.1000
Facsimile: 312.324.1001
salmuddin@morganlewis.com
gabrams@morganlewis.com

Jeremy P. Blumenfeld
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: 215.963.5387/5258/5270
Facsimile: 215.963.5001
mbanks@morganlewis.com
jblumenfeld@morganlewis.com
rdefortuna@morganlewis.com


Dated: July 16, 2008

# EXHIBIT A

## IN ARBITRATION BEFORE THE
## AMERICAN ARBITRATION ASSOCIATION

KARL BEROLZHEIMER, DAVID A.   )
BOHMER, J. THOMAS BROWN, JAMES  )
J. KROPID, WILLIAM J. LAGGETT,    )
JANET A. LANG, SAMUEL E.          )
LEFTWICH, JAMES A. LOVELL, JR.,    )
EDWARD W. MULLINIX, JR., W.J.     )
NESBIT, JR., JAMES D. OGG, LYLE C.  )
ROBERTS, J. STEPHEN            )
VANDERWOUDE, RICHARD         )
VANDERWOUDE, AND PAUL G.      )    Docket No.:
YOVOVICH                      )
                              )
       Claimant,          )
                              )
    v.                     )
                              )
EMBARQ COMMUNICATIONS INC.    )
AS SUCCESSOR IN INTEREST TO    )
CENTEL CORPORATION, SPRINT     )
NEXTEL CORPORATION AS        )
SUCCESSOR IN INTEREST TO      )
CENTEL CORPORATION         )
                              )
       Respondent       )

## STATEMENT OF CLAIM

Claimants Karl Berolzheimer, David A. Bohmer, J. Thomas Brown, James J. Kropid,

William J. Laggett, Janet A. Lang, Samuel E. Leftwich, James A. Lovell, Jr., Edward W.

Mullinix, Jr., W. J. Nesbit, Jr., James D. Ogg, Lyle C. Roberts, J. Stephen Vanderwoude,

Richard Vanderwoude, and Paul G. Yovovich by their attorneys, Nisen & Elliott, LLC, for their

Statement of Claim against respondent Embarq Communications Inc. ("Embarq") and Sprint

Nextel Corporation ("Sprint") state as follows:

1.      Claimants Karl Berolzheimer, David A. Bohmer, J. Thomas Brown, James J. Kropid,

William J. Laggett, Janet A. Lang, Samuel E. Leftwich, James A. Lovell, Jr., Edward W.

Mullinix, Jr., W.J. Nesbit, Jr., James D. Ogg, Lyle C. Roberts, J. Stephen Vanderwoude, Richard

Vanderwoude, and Paul G. Yovovich (collectively "Claimants" or individually a "Claimant") are

individuals and, at all times relevant to this claim, were employed as officers and/or managers of

Centel Corporation or one of its subsidiaries (collectively or individually, "Centel").  Centel was

a holding company that through its subsidiaries was a provider of telecommunication services in

the United States.

2.      Respondent Embarq is a corporation headquartered in Overland Park, Kansas and is a

provider of local telephone, long distance, high speed data and wireless services to residential

and business customers.

3.      Respondent Sprint is a global communications company headquartered in Overland Park,

Kansas which provides a range of wireless and wireline communications products and services.

4.      Following a hostile bid for control of Centel and a proxy contest for control of Centel in

1988, the Board of Directors of Centel determined that there existed a very real possibility that

there could be a change in control of the company through acquisition of stock, a merger, a sale

of assets or other means.  The possibility of a change in control of Centel created a great deal of

uncertainty for officers and managers.  Centel's Board of Directors and executive management

were concerned that key management employees would be distracted from their duties and might

seek other employment which would damage Centel and reduce its value as an ongoing entity.

5.    Faced with the prospect of losing officers and other key management employees in the

volatile environment of the telecommunications industry in 1988, to induce its officers and key

managers (including but not limited to Claimants) to remain in its employ, Centel entered into

Executive Termination Agreements ("ETAs" or individually an "ETA"), dated variously from

1988 through 1992, which provided the Claimants with a package of benefits if they terminated

employment within one year following a change in control of Centel. In consideration of his

agreement to retire on January 1, 1991, Claimant James A. Lovell, Jr. was promised similar

benefits, certain of which promised benefits were memorialized in a letter dated May 20, 1991.

A representative sample of the ETA which was provided to some of the Claimants is attached

and incorporated as "Exhibit A." Exhibit A also includes copies of the January 24, 1991 and

February 27, 1992 amendments to the ETA. One Claimant, James D. Ogg, executed an

additional, later amendment (dated March 7, 1994) to his ETA. This later amendment extended

coverage of benefits under Claimant Ogg's ETA with respect to his transitional assignment after

the change in control. A copy of the letter which memorialized certain of the benefits promised

to Claimant Lovell, and correspondence related thereto (collectively, the "Letter Agreement") is

attached and incorporated as "Exhibit B." The benefits under the ETAs included the payment of

compensation and bonuses linked to the Claimants' compensation at the time of termination. In

addition, under the ETAs and the Letter Agreement, Claimants were promised varying levels of

life, health (including prescription drug) and accident coverage for themselves and their eligible

dependents.


6.    Each of the Claimants with an ETA has fully performed his or her obligations pursuant to

the applicable ETA by remaining in the employ of Centel until termination of service within one year following the change in control which occurred as of December 2, 1992 when the shareholders of Centel approved a merger with Sprint. Claimant Lovell performed the obligations memorialized or confirmed in his Letter Agreement by retiring on January 1, 1991. Each of the Claimants is entitled to all of the compensation, benefits and payments provided under his or her agreement.

7.       In 1993 Centel merged with Sprint Corporation causing a change in control as defined by the ETA. Pursuant to the terms of the successorship clause contained within the ETA (Paragraphs 6(a) and (b)), the obligations of Centel to the Claimants and their eligible dependents were transferred to Sprint. Pursuant to the provisions of the ETA, Centel and its successors were obligated to require any successors to expressly agree to perform the ETA in the same manner and to the same extent that Centel would be required to perform if no such succession had taken place. Sprint confirmed certain of its obligations to Claimant Lovell by correspondence dated August 20, 1999 (*please see* Exhibit B). Further, the ETA also provided that it could not be modified, waived or discharged unless such modification, waiver, or discharge was agreed to in writing by the executive who was the beneficiary of the ETA. None of the Claimants (except Claimant Ogg, as discussed in section 5., above) has executed, at any time, any writing evidencing any modification, waiver or discharge of any of the benefits provisions of any ETA. Nor did Claimant Lovell agree to any modification of the benefits to which he was entitled under the Letter Agreement.

8.       On or about May 17, 2006, the former Centel telephone properties were spun-off by

4

Sprint into Embarq.  Upon information and belief, Sprint has attempted to transfer its obligations under the ETAs and the Letter Agreement to Embarq and avoid further contractual commitments to the Claimants.  Nothing in the ETAs or the Letter Agreement permits such a unilateral transfer of responsibilities.  Accordingly, Sprint remains obligated to the Claimants under the ETAs and the Letter Agreement.

9.     Upon information and belief, Embarq has attempted to assume Sprint's obligations to the Claimants and their eligible dependents with respect to the promised benefits.  On July 27, 2007, Embarq sent a letter (the "July 27, 2007 Notice") to all retirees including, but not limited to, the Claimants, announcing that commencing on January 1, 2008 Embarq would no longer provide medical or prescription drug coverage to Medicare-eligible retirees and their eligible dependents.  Prior to January 1, 2008, employer-subsidized Medicare supplemental medical coverage had been provided to Medicare-eligible retirees and their eligible dependents.  Similarly, prior to such date, these individuals also had prescription drug coverage.  At first, such coverage provided for the full cost of prescription drugs with generally nominal co-payments.  After Medicare Part D was introduced, Medicare-eligible retirees and their eligible dependents were required to participate in that program, but were also provided a $500 per participant annual employer subsidy.  All employer subsidies for these medical and prescription drug coverages were discontinued as of January 1, 2008.  The July 27, 2007 Notice indicated further that life insurance face value amounts would be reduced from the promised levels and "capped" at $10,000 per retiree.  Exhibit C, attached hereto and incorporated herein, lists the face value of the promised life insurance benefits.

5

10.     Notwithstanding numerous demands, Embarq has failed and refused to perform the
obligations under the respective ETAs and the Letter Agreement, including the provision of, and
the payment of its continuing share of the cost of, the contracted-for levels of medical and
prescription drug coverage and life insurance coverage, and has further evidenced its intention to
repudiate any obligations under the ETAs to continue and pay for its share of promised levels of
retiree medical and prescription drug coverage for those Claimants who have, as yet, not attained
age 65. By its actions, Sprint has evidenced its repudiation of its contractual obligations to the
Claimants under the ETAs and the Letter Agreement. By their joint actions, Sprint and Embarq
(hereinafter, collectively and/or individually, the "Obligor") have breached their duties and
responsibilities to Claimants.


COUNT I
Breach of Contract

11.     The allegations of paragraphs 1-9 are incorporated as if fully set forth herein.


12.     Each ETA was, and is, a valid and enforceable contract between the respective Claimant
and Obligor. The Letter Agreement was, and is, a valid and enforceable contract between
Claimant Lovell and Obligor.


13.     By the terms of each ETA and the Letter Agreement, Obligor was obligated to provide,
and pay its continuing share of the costs of, the medical and prescription drug coverage for all of
the Claimants and their eligible dependents and to provide, and pay its continuing share of the

6

costs of, the life insurance coverage identified in the ETA and the Letter Agreement which are specific to each Claimant.

14.    Each Claimant has performed all of his or her respective obligations under the terms of the applicable ETA or the Letter Agreement.

15.    Through Embarq's July 27, 2007 Notice, its subsequent notices to the Claimants of the change in their medical, prescription drug and life insurance coverages and its benefits claim denial letters to Claimants, Obligor has repudiated the ETAs and the Letter Agreement and has failed and refused to perform its obligations thereunder.

COUNT II
Attorneys' Fees

16.    The allegations of paragraph 1-14 above are incorporated as if fully set forth herein.

17.    Pursuant to the provisions of paragraph 4(j) of the ETA (*please see* Exhibit A), Obligor shall pay each Claimant an amount necessary to reimburse all legal fees and expenses incurred in seeking to obtain or enforce any right or benefit provided by the ETA. With respect to certain Claimants, this provision appears, in substantially similar form, as paragraph 4(i) of the ETA.

18.    Because certain Claimants are now enforcing rights and/or benefits provided by the ETAs they are entitled to payment of attorneys' fees and expenses.

7

Wherefore, for all the foregoing reasons, Claimants respectfully request the following relief in arbitration:

1.   A declaration that Obligor was, and is, responsible for providing, and paying its continuing share of the costs of, the levels of medical, prescription drug and life insurance coverages and all other benefits (including, without limitation, medical and prescription drug benefits for those Claimants and their eligible dependents who have not yet attained their Medicare retirement age) identified in the ETAs or the Letter Agreement, as applicable;

2.   An award of the complete restoration of all of the lost benefits required to be provided to the Claimants and their eligible dependents under the ETAs (or the Letter Agreement) and denied by Obligor to date or the equivalent value thereof;

3.   An award of all attorneys' fees, costs and expenses incurred by the Claimants in enforcing their rights to the benefits due them under the ETAs; and

4.   Such further relief as the arbitrator(s) deem just and equitable.

Respectfully submitted,

Karl Berolzheimer, David A. Bohmer, J. Thomas Brown, James J. Kropid, William J. Laggett, Janet A. Lang, Samuel E. Leftwich, James A. Lovell, Jr., Edward W. Mullinix, Jr., W. J. Nesbit, Jr., James D. Ogg, Lyle C. Roberts, J. Stephen Vanderwoude, Richard Vanderwoude, and Paul G. Yovovich

By: _____
One of their attorneys

Michael J. Daley
Nisen & Elliott, LLC
200 W. Adams St., Suite 2500
Chicago, IL 60606
(312) 346-7800

EXHIBIT A

**Representative Sample of**
**Executive Termination Agreement ("ETA")**

(*Please see* the attached ETA for Karl Berolzheimer)

# EXHIBIT A

EXECUTIVE TERMINATION AGREEMENT

This AGREEMENT (Agreement) dated as of August 11, 1988 by and between Centel Corporation, a Kansas corporation (the Company), and Karl Berolzheimer (Executive).

WITNESSETH:

WHEREAS, Executive has been employed by the Company for 11 years and has been effective in his service to the Company, and the Company recognizes the valuable services that Executive has rendered and desires to be assured that Executive will continue his active participation in the management and business of the Company;

WHEREAS, the Company considers the establishment and maintenance of a sound and vital management to be essential to protecting and enhancing the best interests of the Company and its shareholders and the Company recognizes that the possibility of a Change in Control of the Company exists and may exist in the future causing uncertainty among management and resulting in the departure or distraction of management to the detriment of the Company and its shareholders;

WHEREAS, the Board of Directors of the Company (the Board) has determined that appropriate action should be taken to reinforce and encourage the continued attention and dedication of members of the Company's senior management to their assigned duties without distraction in the face of the potentially disturbing circumstances arising from the possibility of a Change in Control of the Company; and

WHEREAS, Executive is willing to continue to serve the Company but desires assurance that in the event of any Change in Control of the Company he will be protected against the financial impact of an unexpected termination;

NOW, THEREFORE, to induce Executive to remain in the employ of the Company and in consideration of Executive's agreeing to remain in the employ of the Company subject to the terms and conditions set forth below, this Agreement sets forth the severance benefits which the Company agrees will be provided to executive in the event Executive's employment with the Company is terminated subsequent to a Change in Control of the Company under the circumstances described below.

1. **Company's Right to Terminate.** During the term of this Agreement, Executive agrees to continue to perform his regular duties as Senior Vice President, General Counsel & Secretary of the Company or such other position to which Executive may be assigned. Notwithstanding the foregoing, the Company may terminate Executive's

- 2 -

employment at any time, subject to providing the benefits hereinafter specified in accordance with the terms hereof.

2.    Change in Control. No benefits shall be payable hereunder unless there shall have been a Change in Control of the Company and Executive's employment by the Company shall thereafter have been terminated in accordance with Section 3 hereof. For the purposes of this Agreement, a Change in Control of the Company shall mean and be deemed to have occurred if (a) any "person" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (Exchange Act)) is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing 25% or more of the combined voting power of the Company's then outstanding securities; (b) at any time a majority of the members of any class of directors are persons who were not nominated for election by the Board; (c) the shareholders of the Company approve a merger or consolidation of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least 80% of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation; (d) the Company shall sell or otherwise dispose of, in one transaction or a series of related transactions, assets or earning power (computed on the basis of earnings before interest and taxes) aggregating more than 50% of the assets or earning power of the Company and its subsidiaries consolidated; or (e) the shareholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of all or substantially all the Company's assets. For the purposes of this Agreement, Control Date means the date on which a Change in Control of the Company occurs.

3.    Termination Following Change in Control. If a Change in Control of the Company shall have occurred, Executive shall be entitled to the benefits provided in Section 4 hereof upon the subsequent termination of Executive's employment within one year thereafter for any reason, voluntary or involuntary, other than discharge for cause, disability or death. For the purposes of this Agreement:

a.    Cause means termination of employment upon (i) the willful and continued failure by Executive to substantially perform his duties with the Company (other than any such failure resulting from Executive's incapacity due to physical or mental illness), after a demand for substantial performance is delivered to Executive by the Chief Executive Officer or the Chairman of the Board of the Company, which specifically identifies the manner in which the Executive has not substantially performed his duties, or (ii) the willful

- 3 -

engaging by Executive in conduct which is demonstrably and materially injurious to the Company, monetarily or otherwise.

b.   Disability means termination of employment under circumstances which would qualify Executive to receive the benefits of the Company's long term disability plan.

c.   Any termination of Executive's employment by the Company shall be communicated by a written notice of termination addressed to Executive and any termination of Executive's employment by Executive shall be communicated by a written notice of termination addressed to the Chief Executive Officer or the Chairman of the Board of the Company. The notice of termination shall specify the date of termination and the characterization of the termination. For the purposes of this Agreement, Notice Date means the date notice of termination is given pursuant to Section 8.

d.   Date of Termination means the date specified in the notice of termination.

4.   Benefits Upon Termination. If Executive's employment by the Company shall be terminated as provided in Section 3, other than for cause, disability or death, Executive shall be entitled to the following benefits, provided that the benefits set forth in paragraphs (c), (d), (e), (g) and (i) shall not exceed the amounts Executive would have received until Executive's normal retirement date:

a.   the Company shall pay Executive his salary through the Date of Termination at the higher of the rate in effect on the Control Date or the Notice Date plus credit for any vacation earned but not taken;

b.   the Company shall pay Executive the amount of Executive's bonus for the preceding calendar year determined in good faith in accordance with the Management Incentive Plan, if it had not been paid prior to the Date of Termination;

c.   the Company shall pay Executive an amount equal to three times Executive's annual salary at the higher of the rate in effect on the Control Date or the Notice Date;

d.   the Company shall pay Executive an amount equal to three times Executive's target bonus at the higher of the rate in effect on the Control Date or the Notice Date under the Management Incentive Plan;

e.   the Company shall pay Executive an amount necessary to reimburse Executive for financial planning and tax preparation services, in accordance with its program in

- 4 -

effect at the date of this Agreement, through the period ending three years after the Date of Termination;

f.  all unvested interests which Executive has in the Centel Retirement Savings Plan and the Centel Incentive Deferred Compensation Plan shall vest and be distributed pursuant to the terms of such plans or the Company shall pay Executive an amount, in cash, equal to the value of his unvested units which do not vest under such plans;

g.  the Company shall maintain in full force and effect, for Executive's continued benefit from the Notice Date through the Date of Termination and thereafter for a period of three years after the Date of Termination all life insurance, dental, health and accident, and disability plans, programs or arrangements in which Executive was entitled to participate immediately prior to the Control Date, to the same extent as if Executive continued to be an employee of the Company during the three year period following the Date of Termination and to the extent such continued participation is not possible, the Company shall arrange to provide Executive with substantially the same benefits; provided that dental and health and accident benefits shall be reduced or offset to the extent they are replaced by substantially similar benefits provided by a new employer;

h.  at the expiration of the three year period after the Date of Termination (or on Executive's normal retirement date if it occurs during such period), the Company shall provide Executive with the same life insurance and health and accident coverage to which Executive would be entitled if Executive had retired on the Date of Termination with fifteen years service;

i.  Executive's retirement benefits shall be augmented by giving Executive credit under the applicable retirement plan for three years of credited service beyond the Date of Termination and including the compensation paid to Executive pursuant to paragraphs (a), (b), (c) and (d) and, to the extent such augmentation is not possible under such plan, the Company shall pay Executive an amount equal to the present value of such augmentation or arrange to provide Executive with substantially the same benefit;

j.  the Company shall pay Executive an amount necessary to reimburse Executive for all legal fees and expenses incurred by Executive as a result of the Change in Control of the Company and such termination of employment, including any fees and expenses incurred in contesting or disputing any

- 5 -

such termination or in seeking to obtain or enforce any right or benefit provided by this Agreement; and

k. if the severance payments provided for under this Agreement, either alone or together with other payments which Executive would have the right to receive from the Company, would constitute a "parachute payment," as defined in Section 280G of the Internal Revenue Code of 1986, as amended (the Code), the Company shall pay Executive an additional amount such that the net amount retained by Executive after payment of any excise tax that would be imposed by Section 4999 of the Code (Excise Tax) and any federal, state and local income tax and Excise Tax payable with respect to the payment provided for in this paragraph, shall be equal to the severance payments provided for under this Agreement. For the purpose of determining the amount of the payment provided for in this paragraph, Executive shall be deemed to pay federal, state and local income taxes at the highest marginal rates in effect on the Date of Termination and the calculation of federal income tax shall take into account the deduction of any state and local income taxes.

The payments provided for in paragraphs (a), (b), (c), (d), (f), (i) and (k) shall be made to Executive within five business days after the Date of Termination, provided, that if the amount of any such payment cannot be determined on or before such day, the Company shall pay Executive on such day an estimate, determined in good faith by the Company, of the minimum amount of such payment and shall pay Executive the remainder of such payment as soon as the amount thereof can be determined, but not later than the twentieth business day after the Date of Termination. The payments provided for in paragraphs (e) and (j) shall be made as soon as possible in the ordinary course in compliance with regular Company practice. All such payments will be subject to applicable payroll or other taxes required to be withheld by the Company.

Payments to Executive hereunder shall be considered severance pay in consideration of past service and continued service after the date of this Agreement and Executive shall not be required to mitigate the amount of any payment provided for in this Section 4 by seeking other employment or otherwise, and, except as provided in paragraph (g) above, the amount of any payment provided for in this Section 4 shall not be reduced by any compensation earned by Executive as the result of employment by another employer after the Date of Termination, or otherwise.

5.   Term of Agreement. This Agreement shall terminate at the close of business April 1, 1993, unless prior thereto a Change in Control of the Company shall have occurred, in which case it shall continue in effect as provided herein.

- 6 -

6.  Successors; Binding Agreement.

a.  The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company, by agreement in form and substance satisfactory to Executive, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place.  Failure of the Company to obtain such agreement prior to the effectiveness of any such succession shall be a breach of this Agreement and shall entitle Executive to compensation from the Company in the same amount and on the same terms as Executive would be entitled hereunder if Executive terminated his employment with the Company following a Change in Control of the Company.

b.  This Agreement shall inure to the benefit of and be enforceable by Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.  If Executive should die while any amount would still be payable to Executive hereunder if Executive had continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to Executive's devisee, legatee or other designee or, if there be no such designee, to Executive's estate.

7.  Notice.  For the purposes of this Agreement, notices and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered or mailed by certified or registered mail, return receipt requested, postage prepaid, addressed, if to the Company

Chief Executive Officer
or
Chairman of the Board
Centel Corporation
8725 Higgins Road
Chicago, IL  60631

or if to Executive

414 Ashland Avenue
Evanston, IL  60202

or to such other address as either party may have furnished to the other in writing in accordance herewith, except that notice of change of address shall be effective only upon receipt.

- 7 -

8. Miscellaneous. No provisions of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing signed by Executive and on behalf of the Company by the Chief Executive Officer, the Chairman of the Board or such other officer as may be specifically designated by the Board. No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which are not expressly set forth in this Agreement. This Agreement shall not supersede or in any way limit the rights, duties or obligations Executive may have under any other written agreement with the Company. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Illinois. This Agreement supersedes a similar agreement between the Company and Executive dated August 14, 1987.

9. Validity. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

10. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

11. Arbitration. Any dispute or controversy arising under or in connection with this Agreement shall be settled exclusively by arbitration in Chicago, Illinois in accordance with the rules of the American Arbitration Association then in effect. Judgment may be entered on the arbitrator's award in any court having jurisdiction.

CENTEL CORPORATION

By: _____
Chairman of the Board

EXECUTIVE

_____
Karl Berolzheimer

AMENDMENT OF
EXECUTIVE TERMINATION AGREEMENT

This agreement amends an Executive Termination Agreement dated as of August 11, 1988 between Centel Corporation and the undersigned Executive (the Agreement) as follows:

1. Section 1 of the Agreement is amended by changing the heading to read "Employment and Termination" and by adding a new second sentence which reads: "All references in this Agreement to employment by the Company and to action taken by the Company with respect to such employment include employment by subsidiaries of the Company and action taken by subsidiaries of the Company with respect to such employment."

2. Section 4.b. is amended to read:

"b. the Company shall pay Executive the amount of Executive's bonus for the preceding calendar year determined in good faith, including matching shares and retention shares, in accordance with the Management Incentive Plan, if it has not been paid prior to the Date of Termination;"

3. Section 4.f. is amended by adding the following phrase after the word "plans" and before the semicolon: "and all of Executive's options and SARs granted under the Centel Stock Option Plan shall become fully exercisable pursuant to the terms of such plan"

4. Section 5 is amended to read:

"5. Term of Agreement. The term of this Agreement shall begin on January 24, 1991 and shall end at the close of business March 31, 1995, unless prior thereto a Change in Control of the Company shall have occurred, in which case it shall continue in effect as provided herein."

Except as amended hereby, the Agreement remains in full force and effect.

CENTEL CORPORATION

By: _____
    Chairman and Chief
    Executive Officer

EXECUTIVE

_____
Karl Berolzheimer

**AMENDMENT OF**
**EXECUTIVE TERMINATION AGREEMENT**

This agreement dated as of February 27, 1992 amends an Executive Termination Agreement dated as of August 11, 1988, as amended January 24, 1991, (the Agreement) as follows:

1.  The first sentence of Section 3 is amended to read:

    "If a Change in Control of the Company shall have occurred, Executive shall be entitled to the benefits provided in Section 4 hereof upon the subsequent termination of Executive's employment during the period between the Control Date and one year after the closing of the disposition of the business unit to which Executive is assigned for any reason, voluntary or involuntary, other than discharge for cause, disability or death."

2.  Section 4.b. is amended to read:

    "b.  the Company shall pay Executive the amount of Executive's target incentive under the Management Incentive Plan for the preceding calendar year, including matching shares and retention shares (or an amount in cash equal to the value of such shares if they cannot be distributed in accordance with the terms of that plan) if they have not been paid or distributed prior to the Date of Termination and an amount equal to the prorated target incentive for the current calendar year at the higher of the rate in effect on the Control Date or the Notice Date, determined in good faith in accordance with the terms of that plan;"

3.  Section 4.d. is amended by substituting the word "incentive" for the word "bonus" in the second line.

4.  The first sentence of Section 6.a. is amended to read:

    "a.  The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company (or, at the sole option of the Company, any successor to all or substantially all of the business or assets of the business unit to which Executive is assigned), by agreement in form and substance satisfactory to Executive, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place."

Amendment of Executive
  Termination Agreement
Dated as of February 27, 1992
Page Two

5.  A new Section 12 is added as follows:

   "**12. Waiver of Plan.**  Executive waives any right to receive
benefits under the Change in Control Plan approved by the Board
of Directors of the Company on February 27, 1992."

Except as amended hereby, the Agreement as heretofore amended
remains in full force and effect.

                              CENTEL CORPORATION


                              By: _____
                                  Chairman and Chief
                                  Executive Officer


                              EXECUTIVE

                              _____
                              Karl Berolzheimer

**EXHIBIT B**

Copy of
Letter Agreement

(*Please see* the attached Letter Agreement
for James A. Lovell, Jr.)

*Centel Corporation*

# EXHIBIT B

*O'Hare Plaza*
*8725 Higgins Road*
*Chicago, IL 60631*
*Telephone 312 399 2765*

**CENTEL**

*J. Robert Dinneen, Jr.*
*Vice President*
*Benefits and Compensation Planning*
May 20, 1991

Mr. James A. Lovell, Jr.
1090 Turicum
Lake Forest, IL 60045

Dear Jim:

This will confirm the arrangement you and Centel have agreed to with respect to post-retirement health coverage for you and Mrs. Lovell.

Effective with your retirement from Centel on January 1, 1991 you and Mrs. Lovell will continue to be covered by Centel's CenCare group health plan. You will purchase this coverage from Centel by paying 100% of Centel's anticipated premium cost for the plan. You will in turn be reimbursed by Centel for this expense. (This does not include the cost of group dental benefits which are being offered on a separate basis under COBRA). The reimbursement will be considered other income to you and will be taxable to you. This arrangement will continue in effect for as long as you live.

If you die before Mrs. Lovell, she will also be entitled to the same arrangement other spouses of deceased Centel covered employees and retirees receive which is as follows:

- Mrs. Lovell will initially receive three months of automatic non-contributory coverage;

- After the initial three months of non-contributory coverage, benefits will then be offered on a fully contributory basis at 100% of the company cost until the earlier of:

    a) remarriage occurring within 36 months of your death which results in Mrs. Lovell becoming covered under the new spouse's group medical plan. However, if that group plan has a pre-existing condition clause, Mrs. Lovell may choose to continue coverage;

    b) remarriage occurring 36 months following your death;

    c) failure to pay the required premium;

Mr. James A. Lovell, Jr.
May 20, 1991
Page 2

    d)  coverage under another group plan. However, if that group plan
        has a pre-existing condition clause, Mrs. Lovell may choose to
        continue coverage;

    e)  death

  If you have any questions about this arrangement or your benefits in general, please call.

Sincerely,

JRD:gis(1E17)

cc:  J. A. Lang
   J. P. Frazee, Jr.



9303 West 110th Street, 6th Floor
Overland Park, KS 66210-1470

KSOPKW0602
(913) 624-1017
(800) 697-6000

August 20, 1999

James A. Lovell, Jr.
1090 Turicum
Lake Forest, IL  60045

Dear Mr. Lovell:

As a response to your request, I am providing this information regarding your life insurance as a retiree from Sprint.

<u>Retiree Life Insurance:</u>  As a retiree of Centel/Sprint, you are covered with term life insurance, valued at $192,500. The cost of this premium is paid by Sprint. The underwriter is Prudential, however, the claim will be processed through our office.

Your primary beneficiary, as provided on your beneficiary designation dated June 2, 1995, is your spouse, Marilyn L. Lovell. I have enclosed a beneficiary form should you wish to change this beneficiary designation.

Should you have any questions, please feel free to contact me at the above number.

Sincerely,

Linda J. Wallace
Benefits Administrator
Corporate Benefits Services

Enclosure

RETIREMENT PENSION PLAN CONFIRMATION STATEMENT
2007 PLAN YEAR

This is your personal Confirmation Statement for your benefits and payment
amounts that will be effective January 1, 2007.

```
LOVELL,JAMES A
Retirement Services
Flex Program ID: 215               LOVELL,JAMES A
Residence Zip:   60045             964 LAKE ROAD
Employee ID:     396248480         LAKE FOREST, IL  60045
Date Printed:    10/17/2006
```

| ME = Medicare Eligible | NME = Not Medicare Eligible | RETIREE MONTHLY PREMIUM |
|---|---|---|
| **MEDICAL PLAN** | | |
| (140) Indemnity Plan-CIGNA | | $0.00 |
| Retiree ME & Dep ME | | |
| **RETIREE LIFE INSURANCE** | | |
| NC Mutual — Coverage Amount: $192,500 | | $0.00 |
| | TOTAL RETIREE MONTHLY PREMIUM $ | 0.00 |

PLEASE NOTE:  Look over your statement carefully.  If you disagree with any of
the above insurance information, it is important that you immediately contact
Retirement Services at 1-800-697-6000.



PAGE  1                                    215/101706/01579/01

EXHIBIT C

Life Insurance Promised to Each Claimant
Pursuant to the Applicable Agreement

| Claimant | Face Value of Promised Life Insurance |
|---|---|
| 1. James A. Lovell, Jr. | $192,500 |
| 2. Samuel E. Leftwich | $142,500 |
| 3. Karl Berolzheimer | $142,500 |
| 4. William J. Laggett | $137,500 |
| 5. J. Stephen Vanderwoude | $127,500 |
| 6. David A. Bohmer | $105,000 |
| 7. Richard Vanderwoude | $100,000 |
| 8. W.J. Nesbit, Jr. | $ 92,000 |
| 9. James J. Kropid | $ 90,000 |
| 10. James D. Ogg | $ 90,000 |
| 11. J. Thomas Brown | $ 80,000 |
| 12. Lyle C. Roberts | $ 65,000 |
| 13. Paul G. Yovovich | $ 40,000 |
| 14. Janet A. Lang | $ 40,000 |
| 15. Edward W. Mullinix, Jr. | $ 40,000 |
| **Total Face Value of Promised Life Insurance** | **$ 1,484,500** |

   



UNITED STATES POSTAGE
$ 06.58⁰
02 1A
0004380689    MAY 29 2008
MAILED FROM ZIP CODE 60606



First Class Mail



CERTIFIED MAIL

7001 2510 0002 4315 7602

**NISEN & ELLIOTT, LLC**
200 West Adams Street, Suite 2500
Chicago, Illinois 60606

Embarq Communications Inc.
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

# EXHIBIT B

EXECUTIVE TERMINATION AGREEMENT


        This AGREEMENT (Agreement) dated as of August 11, 1988 by and between Centel Corporation, a Kansas corporation (the Company), and Karl Berolzheimer (Executive).

WITNESSETH:

        WHEREAS, Executive has been employed by the Company for 11 years and has been effective in his service to the Company, and the Company recognizes the valuable services that Executive has rendered and desires to be assured that Executive will continue his active participation in the management and business of the Company;

        WHEREAS, the Company considers the establishment and maintenance of a sound and vital management to be essential to protecting and enhancing the best interests of the Company and its shareholders and the Company recognizes that the possibility of a Change in Control of the Company exists and may exist in the future causing uncertainty among management and resulting in the departure or distraction of management to the detriment of the Company and its shareholders;

        WHEREAS, the Board of Directors of the Company (the Board) has determined that appropriate action should be taken to reinforce and encourage the continued attention and dedication of members of the Company's senior management to their assigned duties without distraction in the face of the potentially disturbing circumstances arising from the possibility of a Change in Control of the Company; and

        WHEREAS, Executive is willing to continue to serve the Company but desires assurance that in the event of any Change in Control of the Company he will be protected against the financial impact of an unexpected termination;

        NOW, THEREFORE, to induce Executive to remain in the employ of the Company and in consideration of Executive's agreeing to remain in the employ of the Company subject to the terms and conditions set forth below, this Agreement sets forth the severance benefits which the Company agrees will be provided to executive in the event Executive's employment with the Company is terminated subsequent to a Change in Control of the Company under the circumstances described below.

        1.  Company's Right to Terminate. During the term of this Agreement, Executive agrees to continue to perform his regular duties as Senior Vice President, General Counsel & Secretary of the Company or such other position to which Executive may be assigned. Notwithstanding the foregoing, the Company may terminate Executive's

- 2 -

employment at any time, subject to providing the benefits hereinafter specified in accordance with the terms hereof.

2. Change in Control. No benefits shall be payable hereunder unless there shall have been a Change in Control of the Company and Executive's employment by the Company shall thereafter have been terminated in accordance with Section 3 hereof. For the purposes of this Agreement, a Change in Control of the Company shall mean and be deemed to have occurred if (a) any "person" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (Exchange Act)) is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing 25% or more of the combined voting power of the Company's then outstanding securities; (b) at any time a majority of the members of any class of directors are persons who were not nominated for election by the Board; (c) the shareholders of the Company approve a merger or consolidation of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least 80% of the combined voting power of the voting securities of the Company or such surviving entity outstanding immediately after such merger or consolidation; (d) the Company shall sell or otherwise dispose of, in one transaction or a series of related transactions, assets or earning power (computed on the basis of earnings before interest and taxes) aggregating more than 50% of the assets or earning power of the Company and its subsidiaries consolidated; or (e) the shareholders of the Company approve a plan of complete liquidation of the Company or an agreement for the sale or disposition by the Company of all or substantially all the Company's assets. For the purposes of this Agreement, Control Date means the date on which a Change in Control of the Company occurs.

3. Termination Following Change in Control. If a Change in Control of the Company shall have occurred, Executive shall be entitled to the benefits provided in Section 4 hereof upon the subsequent termination of Executive's employment within one year thereafter for any reason, voluntary or involuntary, other than discharge for cause, disability or death. For the purposes of this Agreement:

    a. Cause means termination of employment upon (i) the willful and continued failure by Executive to substantially perform his duties with the Company (other than any such failure resulting from Executive's incapacity due to physical or mental illness), after a demand for substantial performance is delivered to Executive by the Chief Executive Officer or the Chairman of the Board of the Company, which specifically identifies the manner in which the Executive has not substantially performed his duties, or (ii) the willful

- 3 -

engaging by Executive in conduct which is demonstrably and materially injurious to the Company, monetarily or otherwise.

b.    Disability means termination of employment under circumstances which would qualify Executive to receive the benefits of the Company's long term disability plan.

c.    Any termination of Executive's employment by the Company shall be communicated by a written notice of termination addressed to Executive and any termination of Executive's employment by Executive shall be communicated by a written notice of termination addressed to the Chief Executive Officer or the Chairman of the Board of the Company. The notice of termination shall specify the date of termination and the characterization of the termination. For the purposes of this Agreement, Notice Date means the date notice of termination is given pursuant to Section 8.

d.    Date of Termination means the date specified in the notice of termination.

4.    Benefits Upon Termination. If Executive's employment by the Company shall be terminated as provided in Section 3, other than for cause, disability or death, Executive shall be entitled to the following benefits, provided that the benefits set forth in paragraphs (c), (d), (e), (g) and (i) shall not exceed the amounts Executive would have received until Executive's normal retirement date:

a.    the Company shall pay Executive his salary through the Date of Termination at the higher of the rate in effect on the Control Date or the Notice Date plus credit for any vacation earned but not taken;

b.    the Company shall pay Executive the amount of Executive's bonus for the preceding calendar year determined in good faith in accordance with the Management Incentive Plan, if it had not been paid prior to the Date of Termination;

c.    the Company shall pay Executive an amount equal to three times Executive's annual salary at the higher of the rate in effect on the Control Date or the Notice Date;

d.    the Company shall pay Executive an amount equal to three times Executive's target bonus at the higher of the rate in effect on the Control Date or the Notice Date under the Management Incentive Plan;

e.    the Company shall pay Executive an amount necessary to reimburse Executive for financial planning and tax preparation services, in accordance with its program in

- 4 -

effect at the date of this Agreement, through the period ending three years after the Date of Termination;

f. all unvested interests which Executive has in the Centel Retirement Savings Plan and the Centel Incentive Deferred Compensation Plan shall vest and be distributed pursuant to the terms of such plans or the Company shall pay Executive an amount, in cash, equal to the value of his unvested units which do not vest under such plans;

g. the Company shall maintain in full force and effect, for Executive's continued benefit from the Notice Date through the Date of Termination and thereafter for a period of three years after the Date of Termination all life insurance, dental, health and accident, and disability plans, programs or arrangements in which Executive was entitled to participate immediately prior to the Control Date, to the same extent as if Executive continued to be an employee of the Company during the three year period following the Date of Termination and to the extent such continued participation is not possible, the Company shall arrange to provide Executive with substantially the same benefits; provided that dental and health and accident benefits shall be reduced or offset to the extent they are replaced by substantially similar benefits provided by a new employer;

h. at the expiration of the three year period after the Date of Termination (or on Executive's normal retirement date if it occurs during such period), the Company shall provide Executive with the same life insurance and health and accident coverage to which Executive would be entitled if Executive had retired on the Date of Termination with fifteen years service;

i. Executive's retirement benefits shall be augmented by giving Executive credit under the applicable retirement plan for three years of credited service beyond the Date of Termination and including the compensation paid to Executive pursuant to paragraphs (a), (b), (c) and (d) and, to the extent such augmentation is not possible under such plan, the Company shall pay Executive an amount equal to the present value of such augmentation or arrange to provide Executive with substantially the same benefit;

j. the Company shall pay Executive an amount necessary to reimburse Executive for all legal fees and expenses incurred by Executive as a result of the Change in Control of the Company and such termination of employment, including any fees and expenses incurred in contesting or disputing any

- 5 -

such termination or in seeking to obtain or enforce any right or benefit provided by this Agreement; and

k. if the severance payments provided for under this Agreement, either alone or together with other payments which Executive would have the right to receive from the Company, would constitute a "parachute payment," as defined in Section 280G of the Internal Revenue Code of 1986, as amended (the Code), the Company shall pay Executive an additional amount such that the net amount retained by Executive after payment of any excise tax that would be imposed by Section 4999 of the Code (Excise Tax) and any federal, state and local income tax and Excise Tax payable with respect to the payment provided for in this paragraph, shall be equal to the severance payments provided for under this Agreement. For the purpose of determining the amount of the payment provided for in this paragraph, Executive shall be deemed to pay federal, state and local income taxes at the highest marginal rates in effect on the Date of Termination and the calculation of federal income tax shall take into account the deduction of any state and local income taxes.

The payments provided for in paragraphs (a), (b), (c), (d), (f), (i) and (k) shall be made to Executive within five business days after the Date of Termination, provided, that if the amount of any such payment cannot be determined on or before such day, the Company shall pay Executive on such day an estimate, determined in good faith by the Company, of the minimum amount of such payment and shall pay Executive the remainder of such payment as soon as the amount thereof can be determined, but not later than the twentieth business day after the Date of Termination. The payments provided for in paragraphs (e) and (j) shall be made as soon as possible in the ordinary course in compliance with regular Company practice. All such payments will be subject to applicable payroll or other taxes required to be withheld by the Company.

Payments to Executive hereunder shall be considered severance pay in consideration of past service and continued service after the date of this Agreement and Executive shall not be required to mitigate the amount of any payment provided for in this Section 4 by seeking other employment or otherwise, and, except as provided in paragraph (g) above, the amount of any payment provided for in this Section 4 shall not be reduced by any compensation earned by Executive as the result of employment by another employer after the Date of Termination, or otherwise.

5. Term of Agreement. This Agreement shall terminate at the close of business April 1, 1993, unless prior thereto a Change in Control of the Company shall have occurred, in which case it shall continue in effect as provided herein.

- 6 -

6.   Successors; Binding Agreement.

    a.  The Company will require any successor (whether
direct or indirect, by purchase, merger, consolidation or
otherwise) to all or substantially all of the business or
assets of the Company, by agreement in form and substance
satisfactory to Executive, to expressly assume and agree to
perform this Agreement in the same manner and to the same
extent that the Company would be required to perform it if no
such succession had taken place. Failure of the Company to
obtain such agreement prior to the effectiveness of any such
succession shall be a breach of this Agreement and shall
entitle Executive to compensation from the Company in the
same amount and on the same terms as Executive would be
entitled hereunder if Executive terminated his employment
with the Company following a Change in Control of the
Company.

    b.  This Agreement shall inure to the benefit of and be
enforceable by Executive's personal or legal representatives,
executors, administrators, successors, heirs, distributees,
devisees and legatees. If Executive should die while any
amount would still be payable to Executive hereunder if
Executive had continued to live, all such amounts, unless
otherwise provided herein, shall be paid in accordance with
the terms of this Agreement to Executive's devisee, legatee
or other designee or, if there be no such designee, to
Executive's estate.

    7.   Notice. For the purposes of this Agreement, notices and all
other communications provided for in this Agreement shall be in
writing and shall be deemed to have been duly given when delivered or
mailed by certified or registered mail, return receipt requested,
postage prepaid, addressed, if to the Company

                Chief Executive Officer
                          or
                Chairman of the Board
                Centel Corporation
                8725 Higgins Road
                Chicago, IL  60631

or if to Executive

                414 Ashland Avenue
                Evanston, IL  60202

or to such other address as either party may have furnished to the
other in writing in accordance herewith, except that notice of change
of address shall be effective only upon receipt.

- 7 -

8. **Miscellaneous.** No provisions of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing signed by Executive and on behalf of the Company by the Chief Executive Officer, the Chairman of the Board or such other officer as may be specifically designated by the Board. No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which are not expressly set forth in this Agreement. This Agreement shall not supersede or in any way limit the rights, duties or obligations Executive may have under any other written agreement with the Company. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Illinois. This Agreement supersedes a similar agreement between the Company and Executive dated August 14, 1987.

9. **Validity.** The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

10. **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

11. **Arbitration.** Any dispute or controversy arising under or in connection with this Agreement shall be settled exclusively by arbitration in Chicago, Illinois in accordance with the rules of the American Arbitration Association then in effect. Judgment may be entered on the arbitrator's award in any court having jurisdiction.

CENTEL CORPORATION

By: _____
    Chairman of the Board

EXECUTIVE

_____
Karl Berolzheimer

**AMENDMENT OF**
**EXECUTIVE TERMINATION AGREEMENT**

This agreement amends an Executive Termination Agreement dated as of August 11, 1988 between Centel Corporation and the undersigned Executive (the Agreement) as follows:

1. Section 1 of the Agreement is amended by changing the heading to read "Employment and Termination" and by adding a new second sentence which reads: "All references in this Agreement to employment by the Company and to action taken by the Company with respect to such employment include employment by subsidiaries of the Company and action taken by subsidiaries of the Company with respect to such employment."

2. Section 4.b. is amended to read:

"b. the Company shall pay Executive the amount of Executive's bonus for the preceding calendar year determined in good faith, including matching shares and retention shares, in accordance with the Management Incentive Plan, if it has not been paid prior to the Date of Termination;"

3. Section 4.f. is amended by adding the following phrase after the word "plans" and before the semicolon: "and all of Executive's options and SARs granted under the Centel Stock Option Plan shall become fully exercisable pursuant to the terms of such plan"

4. Section 5 is amended to read:

"5. Term of Agreement. The term of this Agreement shall begin on January 24, 1991 and shall end at the close of business March 31, 1995, unless prior thereto a Change in Control of the Company shall have occurred, in which case it shall continue in effect as provided herein."

Except as amended hereby, the Agreement remains in full force and effect.

CENTEL CORPORATION

By: _____
Chairman and Chief
Executive Officer

EXECUTIVE

_____
Karl Berolzheimer

## AMENDMENT OF
## EXECUTIVE TERMINATION AGREEMENT

This agreement dated as of February 27, 1992 amends an Executive Termination Agreement dated as of August 11, 1988, as amended January 24, 1991, (the Agreement) as follows:

1.   The first sentence of Section 3 is amended to read:

"If a Change in Control of the Company shall have occurred, Executive shall be entitled to the benefits provided in Section 4 hereof upon the subsequent termination of Executive's employment during the period between the Control Date and one year after the closing of the disposition of the business unit to which Executive is assigned for any reason, voluntary or involuntary, other than discharge for cause, disability or death."

2.   Section 4.b. is amended to read:

"b. the Company shall pay Executive the amount of Executive's target incentive under the Management Incentive Plan for the preceding calendar year, including matching shares and retention shares (or an amount in cash equal to the value of such shares if they cannot be distributed in accordance with the terms of that plan) if they have not been paid or distributed prior to the Date of Termination and an amount equal to the prorated target incentive for the current calendar year at the higher of the rate in effect on the Control Date or the Notice Date, determined in good faith in accordance with the terms of that plan;"

3.   Section 4.d. is amended by substituting the word "incentive" for the word "bonus" in the second line.

4.   The first sentence of Section 6.a. is amended to read:

"a. The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company (or, at the sole option of the Company, any successor to all or substantially all of the business or assets of the business unit to which Executive is assigned), by agreement in form and substance satisfactory to Executive, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform it if no such succession had taken place."

Amendment of Executive
  Termination Agreement
Dated as of February 27, 1992
Page Two


5.  A new Section 12 is added as follows:

   "**12. Waiver of Plan.**  Executive waives any right to receive
benefits under the Change in Control Plan approved by the Board
of Directors of the Company on February 27, 1992."

Except as amended hereby, the Agreement as heretofore amended
remains in full force and effect.

                         CENTEL CORPORATION


                         By: _____
                             Chairman and Chief
                             Executive Officer


                         EXECUTIVE

                         _____
                         Karl Berolzheimer

# EXHIBIT C

Retired 1989 – 1994
CenCare Plan
Branch 0543 – under 65
Branch 0943 – over 65

# *Your Group Benefit Plan Description*

*Salaried Employees of Telephone Operations, Cellular and Videopath, including Corporate and Telephone Staff*

*Printed September, 1992*

# *Your Group Benefit Plan Description*

*For Certain Salaried Employees of Telephone and Cellular Operations, including Corporate and Telephone Staff, and Centel Videopath*



## Post-Retirement Benefits

### Term Life Insurance

If you are eligible to retire and are insured for Group Term Life Insurance on the day immediately preceding your retirement, you thereafter will be eligible for insurance in an amount equal to the lesser of:

1. 50% of the amount of Group Term Life Insurance prior to your retirement and

2. $40,000.

However, if you were an active employee on the date the $40,000 maximum was implemented and your amount of insurance was greater than $80,000, your amount of insurance upon retirement will be 50% of the amount for which you were insured on that date. The cost of this coverage is paid for by the company.

Centel expects to continue the Benefit Plan indefinitely, but we necessarily reserve the right to modify or discontinue it at any time. Such action would modify or terminate any coverage in effect at such time for active or retired employees.

### Accidental Death and Dismemberment Insurance, Long Term Disability Insurance and Dental Expense Benefit

The insurance and benefits will terminate on your date of retirement.

### Major Medical Expense and Supplemental Accident Benefits

After you retire, you will continue to be covered under the medical coverage if:

- You retire on or after your 65th birthday with 15 or more years of service. Medical coverage for you and your eligible dependents will be continued at no cost to you. However, Centel does reserve the right to add or increase retiree medical contributions at any time based on benefit plan changes and/or future cost increases.

- You retire prior to age 65 or retire on or after your 65th birthday with less than 15 years of service but with at least five years of service. A contribution is required for continuing medical coverage into retirement. The percent of expected premium will depend on your years of service at retirement and your age, according to the schedule shown on the following page. Centel does reserve the right to increase the level of retiree medical contributions at any time based on benefit plan changes and/or future cost increases. Contact your Benefit Representative regarding the contribution rate.

| Years of Service at Retirement | Contributions Before Age 65 | | Contributions After Age 65 | |
|---|---|---|---|---|
| | Paid by Centel | Paid By Retiree | Paid by Centel | Paid By Retiree |
| more than 29 | 85% | 15% | 100% | 0% |
| 25-29 | 80 | 20 | 100 | 0 |
| 20-24 | 60 | 40 | 100 | 0 |
| 15-19 | 40 | 60 | 100 | 0 |
| 5-14 | 0 | 100 | 0 | 100 |
| less than 5 | Not Available | | Not Available | |

However, if you retire before January 1, 1994, (within 5 years of the implementation of CenCare medical on January 1, 1989), you will continue to be covered under the medical coverage if:

- You retire on or after age 65 regardless of service, or after age 55 with 15 or more years of service. Medical coverage for you and your eligible dependents will be continued at no cost to you. However, Centel does reserve the right to add or increase retiree medical contributions at any time based on benefit plan changes and/or future cost increases.

- You retire prior to age 65 with less than 15 years of service but with at least five years of service. A contribution is required for continuing medical coverage into retirement. Centel does reserve the right to increase the level of retiree medical contributions at any time based on benefit plan changes and/or future cost increases. Contact your Benefit Representative regarding the contribution rate.

If you retire with less than 5 years of service, or fail to make the required contribution for coverage, your medical coverage will be terminated. However, you may elect to continue the coverage as described in the section entitled "Termination of Coverage".

Currently your medical benefits are very similar to the benefits you had as an active employee; the same expenses are covered, and at the same rate. However, after you reach age 65, the federal government's Medicare program helps pay for your medical expenses -- so your medical benefits from our Plan are determined differently.

Centel expects to continue the Benefit Plan indefinitely, but we necessarily reserve the right to modify or discontinue it at any time. Such action would modify or terminate any coverage in effect at such time for active or retired employees.

## Your Benefits and Medicare

To fully understand how your medical expenses are paid in retirement after you reach age 65, it's important to first understand how Medicare works.

# EXHIBIT D

**EMBARQ RETIREE MEDICAL PLAN**

## EMBARQ RETIREE MEDICAL PLAN

In accordance with Section 8 of the Employee Matters Agreement dated May 17, 2006 by and between Sprint Nextel Corporation ("Sprint Nextel") and Embarq Corporation, the Company hereby establishes, effective as of May 17, 2006, a retiree medical plan for its employees as set forth herein.

### Article 1. Definitions

1.1    Affiliated Company – (a) the Company, (b) a member of a controlled group of corporations of which an Employer is a member, (c) an unincorporated trade or business which is under common control with an Employer as determined in accordance with section 414(c) of the Code, (d) a member of an affiliated service group with an Employer as defined in Section 414(m) of the Code or (e) any other entity that must be aggregated with an Employer under Section 414(o) of the Code, a corporation or an unincorporated trade or business shall not be considered an Affiliated Company for any period it does not satisfy clause (a), (b), (c), (d) or (e) of this definition.  For purposes of this definition, a "controlled group of corporations" is a controlled group of corporations as defined in section 1563(a) of the Code.

1.2    Board – the Board of Directors of the Company.

1.3    Code – the Internal Revenue Code of 1986, as amended from time to time. References to any section of the Code shall be to that section as it may be renumbered, amended, supplemented or reenacted from time to time

1.4    Committee – the Employee Benefits Committee established pursuant to Section 6.2.

2

1.5    Company – . Embarq Corporation, a Delaware corporation ("Embarq") and its successor or successors.

1.6    Dependents – the following individuals with respect to a Participant as of the date of his Retirement:

> (a) his spouse.
>
> (b) his unmarried child who has not attained age 19.
>
> (c) his unmarried child who is a full-time student at an accredited educational institution which maintains a regular faculty and curriculum and who has not attained age 25.
>
> (d) his unmarried child whom the Committee determines is dependent on the Participant as the result of a physical handicap, mental retardation, a mental illness or a developmental disability.
>
> (e) his qualified domestic partner.
>
> (f) an individual other than the Participant's spouse or child, who is determined by the Committee to be a Dependent.

For purposes of the above definition, an individual shall be deemed to attain age 19 or age 25 on the first day of the month immediately following his 19th or 25th birthday, respectively.

After a Participant's Retirement, no individual shall become his Dependent.

An individual shall cease to be a Participant's Dependent as of the first day of the month following the earlier of his ceasing to satisfy the conditions of any of clauses (a) – (f) above or his death.

3

1.7    <u>Eligible Employee</u> – an Employee who has a Retirement after December 31, 1990.

1.8    <u>Employee</u> – an individual who is employed by an Affiliated Company who receives regular stated compensation other than a pension, severance pay, retainer or fee under contract.  A leased employee (as defined in Section 414(n) of the Code) shall not be treated as an Employee for purposes of this Plan.

1.9    <u>Employer</u> – the Company or any other Affiliated Company which adopted this Plan with respect to its Employees with the approval of the Committee.

1.10    <u>ERISA</u> – the Employee Retirement Income Security Act of 1974, as it may from time to time be amended or supplemented.  References to any section of ERISA shall be to that section as it may be renumbered, amended, supplemented or reenacted.

1.11    <u>Fixed Dollar Amount</u> – the dollar amount determined by the Company in accordance with Section 3.2 for each Plan Year for each coverage category of Participant.

1.12    <u>Participant</u> – a Participant in this Plan.

1.13    <u>Period of Service</u> – a Participant's benefit accrual period of service under the Retirement Plan (excluding any such period taken into account in accordance with the third sentence of this definition).  For purposes of this Plan, the portion of a Participant's benefit accrual period of service under the Retirement Plan before January 1, 1991 shall be counted twice.  In the case of a Participant who was employed by an Affiliated Company for any period during which that company did not adopt the Retirement Plan, his Period of Service for the period of such employment shall be determined as if he participated in the Retirement Plan.

4

1.14  <u>Plan</u> – the retiree medical plan set forth in this document and as it may from time to time be amended or supplemented.

1.15  <u>Plan Year</u> – the twelve (12)-consecutive month period ending December 31 each year.

1.16  <u>Price Tag</u> – the dollar amount needed from a Participant's Retiree Medical Account to purchase benefits under the Medical Plan and Dental Plan for a Plan Year.

1.17  <u>Retiree Medical Account</u> – a separate account maintained for each Participant reflecting his Retiree Medical Dollars credited under Section 3.1 and amounts credited to or chargeable against that account under Sections 4.4(a) and 4.4(b).

1.18  <u>Retiree Medical Dollars</u> – the dollar amount credited to a Participant's Retiree Medical Account under Section 3.1 for a calendar month.

1.19  <u>Retirement</u> – an Employee's retirement under the Retirement Plan as the result of (a) normal retirement (termination of employment with an Affiliated Company upon attaining age 65 on or after a vesting period of service of at least five years or the fifth anniversary of the time he became a member, if he is still employed), (b) late retirement (termination of employment with an Affiliated Company after normal retirement as described in clause (a)), (c) early retirement (termination of employment with an Affiliated Company after attaining age 55 and with a vesting period of service of at least 10 years), (d) special early retirement (termination of employment with an Affiliated Company (i) on or after attaining an age which when added to the number of years of his benefit accrual period of service equals at least 75 and (ii) as a result of special circumstances including a plant shut down, determination that the Participant is incapable of performing his job, or elimination of a Participant's job due to change in

operations or corporate structure), (e) disability retirement (termination of employment with an Affiliated Company after a vesting period of service of at least 10 years, as a result of a disability for which the Participant has applied for or has been granted a Social Security disability benefit and which the Committee determines to be a total and permanent disability).

In the case of an Employee of an Employer who is not a participant in the Retirement Plan, he shall be deemed to have a Retirement on the date he would have retired under the Retirement Plan had he been a participant in that plan.

For purposes of this definition, the term Vesting Period of Service is as defined in the Retirement Plan.

1.20    Retirement Plan – Embarq Retirement Pension Plan.

1.21    Shortfall – an amount for a Plan Year for Participant equal to the excess of (a) the aggregate Price Tags for coverage elected by that Participant for that Plan Year for medical and dental coverage over (b) the amount of the aggregate credits to the Participant's Retiree Medical Account for that Plan Year, taking into account Retiree Medical Dollars credited under Section 3.1 and any excess balance credited under Section 4.4(b).  If there is a change in medical coverage or dental coverage during a Plan Year in accordance with Section 2.4, 3.3(b) or 4.2, the Shortfall for that Plan Year shall be recalculated to reflect that change effective as of the date of the change.

## Article II.  Participation

2.1    Participation of Employees.    An Eligible Employee shall become a Participant as of the later of (a) the first day of the month following the day he becomes an Eligible Employee or (b) in the case of an Eligible Employee covered as a dependent

of a participant under the Embarq Medical Plan, as of the first day of the month following the day he ceases to be so covered under that plan.

2.2    <u>Participant Information</u>.    Before becoming a Participant, an Eligible Employee (including an Eligible Employee who intends to suspend coverage in accordance with Section 2.4) shall (a) elect in accordance with Section 4.1 a medical coverage option and whether or not to have dental coverage, and (b) furnish to the Committee (in such form and at such time as the Committee shall prescribe) the names and ages of each of his Dependents and such other information pertaining to his Dependents as the Committee shall request.  An Eligible Employee who fails to make the election and provide the information described in the previous sentence shall be deemed (1) to have elected the high deductible medical indemnity option and no dental coverage and (2) to have no Dependents.

A Participant shall promptly notify the Committee of the change of his marital status, the death of a Dependent, the change in marital status of a Dependent child, the change in student status of a Dependent child who has attained age 19 and such other information as the Committee shall request.

2.3    <u>Cessation of Participation</u>.    Subject to Section 2.4(a), a Participant shall cease to be a Participant upon the earlier of the first day of the month following (a) his death or (b) his failure to make cash payments necessary to pay the Price Tag of the high deductible medical indemnity coverage option for himself and no Dependents.  Except as provided in Article 5, a Participant's Dependents shall cease to be covered under the Plan upon the Participant's ceasing to be a Participant.

2.4    <u>Coverage by Another Employer's Plan; Suspension of Participants</u>.

7

a)      A Participant who is eligible for medical coverage in connection with his employment by an employer which is not an Affiliated Company ("non-affiliated employer") must not waive that coverage in order to remain a Participant.  A Participant who waives that coverage provided by a non-affiliated employer shall cease to be a Participant as of the first day of the month following the waiver.

(b)      A Participant who has medical coverage in connection with his employment by a non-affiliated employer or has a spouse who has such coverage may elect (in such form and at such time as the Committee shall prescribe) to suspend coverage under this Plan for himself and his Dependents during any period of such other coverage.  A Participant who suspends coverage under this Section 2.4(b): (1) shall not receive Retiree Medical Dollars during the period of suspension, (2) shall not be required to make any cash contributions under Section 4.5, during the period of suspension and (3) shall retain any excess credit balance in his Retiree Medical Account attributable to participation in this Plan before the suspension.

(c)      A Participant who has a spouse who has medical coverage in connection with her employment by a non-affiliated employer may elect (in such form and at such time as the Committee shall prescribe) to suspend the coverage for his spouse under this Plan during any period of such other coverage.  A Participant who suspends coverage of his spouse under this Section 2.4c shall during the period of suspension receive Retiree Medical Dollars and have his Price Tag determined as if his spouse were not a Dependent.

(d)      A Participant's election to suspend coverage under Section 2.4(b) or (c) shall be effective as of the first day of the month following the election.

(e)    A Participant who suspends coverage under this Plan for himself and his Dependents in accordance with Section 2.4(b) must resume coverage under this Plan not later than the first day of the month coincident with or next following the day 60 days after the later of the cessation of his or his spouse's medical coverage provided by a non-affiliated employer.  If he fails to resume coverage within the stated time period he shall cease to be a Participant under this Plan.  A Participant who suspends coverage of his spouse under this Plan in accordance with the Section 2.4(c) must resume coverage of his spouse not later than the first day of the month coincident with or next following the day 60 days after the cessation of his spouse's other medical coverage.  If the Participant fails to resume his spouse's coverage within the stated time period, his spouse shall cease to be covered as a Dependent under this Plan.

2.5    <u>Rehired Participant</u>.

(a)    If a Participant is rehired by an Affiliated Company and if he is then eligible for coverage under that Affiliated Company's medical plan and dental plan for active employees ("rehired Participant"), he shall cease to be covered by this Plan during the period of such eligibility.

(b)    Subject to Section 2.5(a), if a rehired Participant (or former Participant) terminates employment from all Affiliated Companies (other than as the result of disability retirement) within one year of being rehired, he shall be treated for all purposes of the Plan as if he had never been rehired.

(c)    If a rehired Participant (or former Participant) terminates employment from all Affiliated Companies more than after one year after being rehired (or as the result of disability retirement), he shall be treated for all purposes of this Plan

9

as if his prior Retirement had never occurred, except that (1) any excess credit balance in his Retiree Medical Account at the time he ceased to be  Participant shall be restored and (2) in the case of a rehired Participant whose original Retirement was a special early retirement, his termination of employment shall be deemed a Retirement even if it does not otherwise satisfy the conditions for a Retirement.

### Article III.  Retiree Medical Dollars

3.1    _General_.    Subject to Section 3.4, the Retiree Medical Account of a Participant who has a Retirement after December 31, 1990, shall be credited as of the first day of each calendar month of each Plan Year beginning with 1991 with an amount of Retiree Medical Dollars equal to the product of (a) one-twelfth of the Fixed Dollar Amount for the Plan Year which corresponds to his coverage category determined under Section 3.3 for that month and (b) a percentage equal to the sum of (1) 30% and (2) 3.5% for each of the years of his Period of Service in excess of 10 but not in excess of 30.

3.2    _Fixed Dollar Amounts_.    The Fixed Dollar Amounts for each coverage category of Participants shall be determined annually by the Committee.

3.3    _Participant's Coverage Category._

(a)    The Committee shall determine, based on the information provided by the Participant under Section 2.2 and any other relevant information available to it, each Participant's coverage category from among the following:

(1)    Participant who is eligible for Medicare and does not have any Dependents.

(2)    Participant who is not eligible for Medicare and does not have any Dependents.

(3)   Participant who is eligible for Medicare and has only one Dependent and that Dependent is not eligible for Medicare.

(4)   Participant who is not eligible for Medicare and has only one Dependent and that Dependent is not eligible for Medicare.

(5)   Participant who is eligible for Medicare and has only one Dependent and that Dependent is eligible for Medicare.

(6)   Participant who is not eligible for Medicare and has only one Dependent and that Dependent is eligible for Medicare.

(7)   Participant who is eligible for Medicare and has more than one Dependent.

(8)   Participant who is not eligible for Medicare and has more than one Dependent.

The Committee shall change the Participant's coverage category, if necessary, as of the first day of the month, following the month in which a Participant's Dependent ceases to be a Dependent.

(b)   A Participant may irrevocably elect before the first day of any calendar month (in such form and at such time as the Committee shall prescribe) not to cover one or more of his Dependents as of first day of that calendar month and thereafter. The Committee shall redetermine the coverage category of a Participant based on his election under the preceding sentence.

(c)     If a Participant's coverage category is changed, as of the first day of the month following that change his Retiree Medical Dollars under Section 3.1 shall be adjusted to reflect that change.

3.4     <u>Early Retirement Reduction</u>.  In the case of a Participant who was born on or after December 31, 1946 and has a Retirement (other than as a result of a disability retirement) before attaining age 65, for each calendar month ending with the month in which he attains age 65, his Retiree Medical Dollars shall be reduced by $5/12^{th}$ of one percent for each month by which his Retirement precedes the last day of the month in which he attains age 65.

### Article IV.  Medical and Dental Coverage

4.1     <u>Election of Medical Coverage Option and Dental Coverage Option</u>.  To make a valid election, a Participant must elect before the first day of the month in which he becomes a Participant under Section 2.1 (in such form and at such time as the Committee shall prescribe) among the following medical coverage options:  (a) low deductible medical indemnity coverage, (b) high deductible medical indemnity coverage or (c) a managed care option (if available).  In addition to electing a medical coverage option, a Participant may elect dental coverage.  If a Participant does not initially elect dental coverage, he may not subsequently elect dental coverage.  Except as provided in Section 2.4(c), a Participant's election of a medical coverage option and dental coverage option shall apply to his Dependents and shall remain in effect while he is a Participant until effectively changed in accordance with Section 4.2.

4.2     <u>Change in Medical Coverage Option and Dental Coverage Option</u>.  A Participant may change his election of a medical coverage option or dental coverage

option upon notice to the Committee (in such form at such time as the Committee shall prescribe) as follows:

(a)    A Participant who has in effect an election of medical indemnity coverage may make the following changes:  (1) subject to Section 4.2(c), he may change effective as of the first day of the calendar month following his notice to a different medical indemnity coverage option or (2) he may elect effective as of the January 1 following his notice to be covered under a managed care option.

(b)    Subject to Section 4.2(c), a Participant who has in effect an election of medical coverage under a managed care option may make the following changes:  (1) he may change effective as of the January 1 following his election to a medical indemnity coverage option or a different managed care option or (2) if coverage under the managed care option ceases to be available, he may change effective as of the first day of the month following that cessation to a medical indemnity coverage option or a different managed care option.

(c)    In no event may a Participant elect under Section 4.2(a) or (b) to change to a medical indemnity option in a lower deductible category than he previously elected.

4.3    Price Tags.  Before the beginning of each Plan Year, the Committee shall determine the Price Tags for that Plan Year for each coverage category of participant under Section 3.3 for each of the medical coverage options and dental coverage options.

4.4    Adjustment to Credit Balances in Retiree Medical Accounts.

(a)    The credit balance in a Participant's Retiree Medical Account as of the last day of each calendar month shall be reduced (but not below zero) by an amount

13

equal to one-twelfth of the sum of the Price Tags for the Plan Year of the medical coverage option he elected and dental coverage option, if any, he elected.

(b)     Except as otherwise provided in the following sentence, if as of the last day of any Plan Year there remains an excess credit balance in a Participant's Retiree Medical Account (after reducing the Retiree Medical Account for the month of December of that Plan Year under Section 4.4(a)), then one-twelfth of that excess credit balance shall be added to the credit balance in the Participant's Retiree Medical Account as of the first day of each month of the following Plan Year.  In the case of a Participant who is deemed to have elected the high deductible medical indemnity option for himself and no Dependents under Section 2.2 (for failure to make an initial election) or under Section 4.5 (for failure to make cash contributions), a portion of his unused excess credit balance shall be added to the credit balance in his Retiree Medical Account as of the first day of each month to the extent that it enables him to pay the Price Tag for that coverage for that month.

(c)     The Committee shall make a determination before the beginning of each Plan Year whether there will be a Shortfall with respect to a Participant.  If the Committee determines that there will be a Shortfall for a Participant, the Participant shall contribute the amount of that Shortfall in accordance with Section 4.5.

4.5     Cash Contributions.

(a)     A Participant shall make cash contributions to the Plan in the amount of the Shortfall or a Plan Year.  Except as otherwise provided in the following sentence, a Participant's cash contribution shall be made for a Plan Year by reducing each of his monthly payments under the Retirement Plan for that Plan Year by one-

twelfth of the Shortfall for that Plan Year. If a Participant (1) is not entitled to receive a monthly payment under the Retirement Plan, (2) the Participant's monthly payment under the Retirement Plan is less than one-twelfth of the Shortfall or (3) the Participant does not agree to have his payments under the Retirement Plan reduced to make the payment under this Section 4.5, the Participant shall make a cash payment to the Plan before the beginning of that Plan Year (at such time as the Committee may prescribe). The amount of that cash contribution shall be equal in amount to the portion (or all) of the Shortfall not paid through a reduction of monthly payments from the Retirement Plan. If due to a change in medical or dental coverage in accordance with Section 3.3(b) or 4.2, suspension of participation under Section 2.4 or death, the Committee determines that the cash contribution made by a Participant before the beginning of a Plan Year exceeds the recalculated Shortfall, the excess shall be returned to him (or his estate) without interest as soon as practicable after the Committee's determination.

(b)    In the event that a Participant fails to make cash contributions to the Plan in accordance with Section 4.5(a) and does not elect to change his coverage under this Plan so as not to require cash contributions, he shall be deemed to have elected the high deductible medical indemnity option for himself and no Dependents. If, as of the first day of any calendar month, the credit balance in the Retiree Medical Account (after crediting Retiree Medical Dollars under Section 3.1) of a Participant described in the above sentence is not sufficient, without any cash payments, to pay the Price Tag for coverage, he shall cease to be a Participant as of that day.

4.6    Medical and Dental Coverage.  The description of the medical coverage options and the description of the dental coverage indemnity option are set forth in the

Summary Plan Description ("SPD"). The provisions of the SPD are incorporated herein by reference. The terms and conditions of coverage provided by each managed care option are set forth in individual agreements directly between those organizations and the Participants who elected coverage thereunder, and such agreements are incorporated herein by reference.

4.7    Benefits Carve Out. In the case of a Participant or Dependent who (a) is either (1) eligible for Medicare or (2) covered under the medical or dental plan of a non-affiliated employer based on his status as a current or former employee of that employer and (b) elects (1) medical indemnity coverage or (2) dental coverage under this Plan, the amount of reimbursement for a claim under this Plan shall be reduced by the amount of reimbursement with respect to that claim payable by Medicare or that medical or dental plan. For purposes of the preceding sentence, it shall be assumed that  Participant who is eligible for Medicare is covered by Medicare Part B whether or not he is so covered.

### Article V.  Coverage Upon Death of Participant

5.1    General.   Subject to section 5.2, coverage under this Plan for the Participant and all Dependents shall cease upon the first day of the month following the Participant's death.

5.2    Spousal Coverage. In the case of a spouse of a Participant who is covered under the Plan as a Dependent at the time of the Participant's death, the spouse may remain a Participant in accordance with the provisions of this Section 5.2.

(a)    For the six-month period beginning on the first day of the calendar month following the Participant's death the Participant's spouse shall continue to be covered under the Plan as if she were a Participant with no Dependents. Accordingly, (1)

during that six-month period the spouse shall receive monthly credits of Retiree Medical Dollars under Section 3.1 as if she were a Participant with no Dependents, (2) the excess credit balance in the Participant's Retiree Medical Account, if any, shall continue to be credited in accordance with Section 4.4(b), (3) the spouse may make changes in the medical coverage options and dental coverage options in accordance with Section 4.2 or suspend coverage under this Plan in accordance with Section 2.4(a) as if she were the Participant and (4) cash contributions, if any, shall be made by the spouse in accordance with Section 4.5.

(b) For the period beginning on the first day of the seventh month following the Participant's death, the Participant's spouse may continue to participate under the Plan (and suspend coverage in accordance with Section 2.4(a) as if she were the Participant). The spouse will not receive monthly credits of Retiree Medical Dollars under Section 3.1. However, the excess credit balance in the Participant's Retiree Medical Account, if any, shall continue to be credited in accordance with Section 4.4(b) and the spouse may make changes in the medical coverage option and dental coverage in accordance with Section 4.2. Accordingly, the spouse shall be required to make cash contributions (at such time and in such manner as the Committee shall prescribe) in the amount of the full Price Tag for the medical coverage option and dental coverage, if any, elected less the excess credit balance in the Participant's Retiree Medical Account, if any, credited in accordance with Section 4.4(b).

### Article VI. Administration of Plan.

6.1 <u>The Company</u>. The compensation committee of the Board shall have the authority to control and manage the operation and administration of this Plan. The

compensation committee delegates its authority to control and manage the operation and administration of this Plan to the Committee. The Committee shall be the Plan administrator as defined by ERISA.

6.2 <u>The Committee</u>. The Plan shall be administered by the Committee, which shall have the responsibilities and duties and powers delegated to it in this Plan and any responsibilities and duties under this Plan which are not specifically delegated to anyone else, including but not limited to the following powers:

(a) subject to any limitations under the Plan and applicable law, to make and enforce such rules and regulations of the Plan and prescribe the use of such forms as it shall deem necessary for the efficient administration of the Plan;

(b) to require any person to furnish such information as it may request as a condition to receiving any benefit under the Plan;

(c) to decide on questions concerning the Plan and the eligibility of any Employee to participate in the Plan, in accordance with the provisions of the Plan;

(d) to compute or have computed the amount of benefits which shall be payable to any person in accordance with the provisions of the Plan; and

(e) to select and appoint an insurance carrier.

6.3 <u>Discretion of the Committee</u>. Subject to the limitations of the Plan and applicable law, the Committee from time to time may establish rules for the administration of this Plan. The Committee or its delegate shall have the sole discretion

to make decisions and take any action with respect to questions arising in connection with the Plan, including but not limited to the construction and interpretation of the Plan and the determination of eligibility for and the amount and/or definition of Benefits under the Plan. Any such decision or action shall be final and binding upon all Participants and dependents.

6.4     Action by the Committee. A vote of a majority of the members of the Committee shall be required for any action taken by the Committee. Resolutions may be adopted or other action taken without a meeting upon the written consent of all members of the Committee. Any person dealing with the Committee shall be entitled to rely upon a certificate of any member of the Committee, or its secretary, as to any act or determination of the Committee.

6.5     Membership of the Committee. The Committee shall consist of at least five members. The chairpersons of the Committee shall be the vice president of the Company who has responsibility for benefits administration and the vice president of the Company who has responsibility for financial decision support. The chairpersons of the Committee shall appoint the remaining members of the Committee. The chairpersons of the Committee may remove a member and appoint another member at any time, with or without cause, upon written notice to the member being replaced. A chairperson may resign from the Committee by giving 15 days written notice to the Secretary of the Corporation. Such resignation shall not constitute resignation of such person's position of employment with the Company, notwithstanding the plan's description of chairperson based upon employment responsibilities with the Company. Upon such resignation, or in the event the corporate position described for the chairperson does not exist, remains unfilled, or if the individual

filling the position is unwilling or cannot perform the role of chairperson, the compensation committee of the Board shall appoint a chairperson. A member other than a chairperson may resign by giving written notice to a chairperson. During any period that both chairpersons' positions are vacant, the compensation committee shall serve as plan administrator as defined by ERISA.

6.6    <u>Officers and Meetings of the Committee</u>. The Committee shall appoint a secretary, who need not be a member of the Committee, to keep its records and assist it in performing any of its functions. The Committee shall hold regular meetings at least quarterly upon such notice and at such times and places as it may from time to time determine. The secretary of the Committee shall attend all meetings and take minutes thereof. Notice of a meeting need not be given to any member of the Committee who submits a signed waiver of notice before or after the meeting or who attends the meeting.

6.7    <u>Subcommittee, Advisors and Agents of the Plan Committee</u>. The Committee may, subject to periodic review, (a) authorize one or more of its members or an agent to execute or deliver any instrument, and make any payment on its behalf and (b) utilize the services of Employees and engage accountants, agents, clerks, insurance carriers (provided any such insurance carrier is licensed to do business in Kansas), legal counsel, record keepers and professional consultants (any of whom may also be serving the Company or Employer) to assist in the administration of this Plan or to render advice with regard to any responsibility under this Plan.

6.8    <u>Records and Reports of the Committee</u>.  The Committee shall maintain records and accounts relating to the administration of the Plan.  The Committee shall submit to the Board of Directors such reports as the Board of Directors shall request.

6.9    <u>Indemnification of the Committee</u>.  The Employer will indemnify and hold harmless the directors and officers of the Employer, the members of the Employee Benefits Committee and all other Employees of the Employer from any liability, loss, cost or damage that such individuals may incur in the exercise and performance of their duties and powers hereunder, except as may result from their own gross negligence or willful default.  The Employer also will assume the defense of any and all actions, suits or proceedings brought or advanced by any person (other than an Employer) against any such individual arising under the Plan.

6.10    <u>Service in More than One Capacity</u>.  Any person or group of persons may service the Plan in more than one capacity.

6.11    <u>Named Fiduciaries</u>.  The named fiduciaries of the Plan shall be the Company and the Committee.  Each fiduciary shall discharge his or her duties and responsibilities with respect to the Plan solely in the interest of the Participants and Beneficiaries of the Plan according to the terms hereof, for the exclusive purpose of providing Benefits to Participants and their Beneficiaries, with the care, skill, prudence and diligence under the circumstances prevailing from time to time that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

6.12    Plan Expenses.  All expenses relating to the Plan prior to the termination of the Plan shall be expenses of the Plan and, except to the extent paid by the Company, shall be paid by the Plan.  The Company may require any member of the Committee to furnish a fidelity bond satisfactory to the Company; the premium for any fidelity bond shall be an expense of the Plan, except to the extent paid by the Company.

### Article VII.  Benefits and Claims Under the Plan

7.1    Claim for Benefits.  Any claim for benefits under this Plan shall be made in writing to the Committee.  If a claim for benefits is wholly or partially denied, the Committee shall so notify the Participant within 90 days after receipt of the claim.  The notice of denial shall be written in a manner calculated to be understood by the Participant and shall contain (a) the specific reason or reasons for denial of the claim, (b) specific references to the pertinent Plan provisions upon which the denial is based, (c) a description of any additional material or information necessary to perfect the claim together with an explanation of why such material or information is necessary and (d) an explanation of the claims review procedure.

7.2    Review of Claim.  Within 60 days after the receipt by the Participant of notice of denial of a claim (or at such later time as may be reasonable in view of the nature of the benefit subject to the claim and other circumstances), the Participant may (a) file a request with the Committee that it conduct a full and fair review of the denial of the claim, (b) review pertinent documents and (c) submit questions and comments to the Committee in writing.

7.3    Decision After Review.  Within 60 days after the receipt of a request for review under Section 7.2, the Committee shall deliver to the Participant a written

decision with respect to the claim, except that if there are special circumstances (such as the need to hold a hearing) which require more time for processing, the 60-day period shall be extended to 120 days upon notice to the Participant to that effect. The decision shall be written in a manner calculated to be understood by the Participant and shall (a) include the specific reason or reasons for the decision and (b) contain a specific reference to the pertinent Plan provisions upon which the decision is based.

### Article VIII. Amendments; Termination

The Company shall have the sole right to alter, amend or terminate this Plan in whole or in part at any time it determines to be appropriate. The Company shall act through its Board or through any party properly authorized to so act by a Board resolution.

### Article IX. Miscellaneous

9.1 <u>Participant Information</u>. Each Participant shall notify the Committee, insurance company or agent of (a) his mailing address and each change of mailing address, (b) the Participant's and his Dependent's date of birth and (c) his marital status and any change in his marital status. In addition the Participant shall be required to furnish the Committee, insurance company or agent with any other information and data that the Committee, insurance company or agent considers necessary for the proper administration of the Plan. Information and data submitted in conjunction with the retirement or savings program of an Employer may be accepted and used by the Committee, insurance company or agent. The information provided by the Participant under this Section shall be binding upon the Participant and his Dependents for all purposes of the Plan and the Committee, insurance company or agent shall be entitled to

rely on any representations regarding personal facts made by the Participant or his Dependents, unless such representations are known to be false.

     9.2    <u>Governing Law</u>.  The provisions of this Plan shall be governed, construed and administered in accordance with ERISA, the Code, and, where not inconsistent, the laws of the state of Delaware.

     9.3    <u>Notices</u>.  Any notice, request, election, or other communication under this Plan shall be in writing and shall be considered given when delivered personally or mailed by first class mail.

     9.4    <u>Heading</u>.  The headings in this Plan are for convenience of reference and shall not be given substantive effect.

     9.5    <u>Severability</u>.  If any provision of this Plan is held illegal or invalid for any reason, the other provisions of this Plan shall not be affected.

     9.6    <u>Construction</u>.  Any masculine personal pronoun shall be considered to mean also the corresponding female or neuter personal pronoun, as the context requires. The singular and plural forms of any term used in this Plan shall be interchangeable, as the context requires.

EMBARQ CORPORATION

By   _____

Attest:

_____
Secretary

# EXHIBIT E



Voice  Data  Internet  Wireless  Entertainment

**Benefits Department**
Mailstop KSOPKJ0201-2067
5454 West 110th Street
Overland Park, KS 66211

July 26, 2007

Today EMBARQ announced significant changes to three areas of our retiree benefits program — medical coverage, life insurance and the matching gifts program.

Recent developments in the Medicare marketplace make it more practical and efficient for Medicare-eligible individuals to purchase medical coverage directly through a national carrier or one of the many companies who specialize in the Medicare market than for EMBARQ to provide this coverage.

This brochure outlines these medical coverage changes, as well as changes to retiree life insurance and the matching gifts program.  The brochure also is a summary of material modifications to the summary plan description for the Embarq Retiree Medical Plan.

If you are a Medicare-eligible retiree or have Medicare-eligible dependents, you will receive more detailed information from EMBARQ about the medical changes as soon as arrangements are finalized, likely before mid-September.  Also, you may be contacted by a national health care benefits company to offer you help in understanding your medical coverage alternatives and information about the options they offer for medical coverage. In the meantime, we encourage you to begin researching other alternatives for your medical coverage.

We will keep you up to date and provide you with more information as soon as possible.

Sincerely,

*Randall T Parker*

Randall T. Parker
Director, Benefits

## The EMBARQ™ Mission...
### *To be the first choice to serve the total communications needs of our communities.*

*This brochure provides general information about EMBARQ™ retiree*

# What is changing and when?

## Medical Coverage for Medicare-eligible Individuals...

On January 1, 2008, EMBARQ will no longer offer company-sponsored medical coverage to Medicare-eligible retirees or Medicare-eligible dependents. EMBARQ will continue to offer company-sponsored medical coverage to retirees and dependents who are not eligible for Medicare.

A national health care benefits company identified by EMBARQ will contact you to offer help in understanding your medical coverage alternatives. This company will provide convenient, user-friendly sales and ongoing support, a Web site, a toll-free telephone help line and easy-to-read printed materials. In addition, the company will conduct informational meetings in select locations.

Other carriers likely will offer coverage options to you as well. EMBARQ is not endorsing any particular carrier or coverage option, so we encourage you to carefully evaluate all of your options. You will be free to choose your own medical coverage provider.

## Monthly Medicare Premium Subsidy...

Starting January 1, 2008, EMBARQ will no longer provide a monthly subsidy for Medicare premiums.

## Life Insurance...

Effective January 1, 2008, any company-provided life insurance benefits will be capped at $10,000. Any current optional life insurance you purchased in the past can continue under the terms of that plan.

## Matching Gifts Program...

The EMBARQ™ Matching Gifts Program will no longer be available for gifts you make after September 1, 2007. All matching gifts program forms must be postmarked by September 30, 2007, to be considered for a matching contribution.

*Practical Ingenuity This is our promise to customers and the marketplace. We found it more practical and efficient for Medicare-eligible individuals to receive medical coverage directly through national carriers who specialize in the Medicare market than for EMBARQ to provide this coverage.*

# Why is this occurring?

To offer high-quality products and services to our customers, EMBARQ must continuously adapt to today's fast-paced and changing communications market. This means that, as an employer, we must periodically adjust the programs we offer to keep the company competitive. Recent changes in the Medicare marketplace make it more practical and efficient for many Medicare-eligible individuals to purchase medical coverage directly through a national carrier or one of the many companies who specialize in the Medicare market than for EMBARQ to provide this coverage.

*enefits changes announced on July 26, 2007.*

### These changes are designed to...

| **Keep EMBARQ competitive** within our industry and the markets where we operate | **Offer more flexibility and choice** to Medicare-eligible retirees and dependents in selecting coverage | **Balance the needs** of EMBARQ retirees, employees, shareholders, customers, and other stakeholders |

Because change can be stressful, we intend to provide the necessary information and support to help you and any covered family members make this transition smoothly.

# When will this happen?

Not all changes will happen at the same time.

* EMBARQ™ Matching Gifts Program change will become effective **September 1, 2007.**
* All other changes will become effective **January 1, 2008.**

# How does this affect you?

Here is the timeline for how the changes will affect you (or your dependent).

### On September 1, 2007...

* Charitable contributions you make will no longer be matched by the company through the EMBARQ™ Matching Gifts Program. All matching gifts program forms must be postmarked by September 30, 2007, to be considered for a matching contribution.

### As of January 1, 2008...

*A recent study shows that only 19 percent of U.S. large employers offer any form of medical coverage to Medicare-eligible retirees.*

* EMBARQ will not offer medical coverage for Medicare-eligible individuals and will no longer provide a monthly subsidy for Medicare premiums. Your current company-sponsored retiree medical plan will end on December 31, 2007.
* If you are Medicare-eligible, you may purchase medical coverage from any company you choose.
* Any company-provided retiree life insurance benefit will not exceed $10,000. Any existing optional life insurance coverage you already have can be continued under the terms of that plan.

# What happens next?

You will receive information in the mail from EMBARQ before mid-September with more details about how these changes affect your individual situation. If you are Medicare-eligible, you also will receive medical coverage information from a national health care company identified by EMBARQ. Other carriers also likely will contact you about their coverage options. EMBARQ is not endorsing or recommending any particular carrier or coverage option and we encourage you to explore all of your options. You will now have the freedom and flexibility to purchase medical coverage from the carrier of your choice.

You may visit the EMBARQ™ Retiree Web site or call the EMBARQ™ Employee Resource Center for information. Please keep in mind that no specific details will be available for a few weeks.

### EMBARQ™ Retiree Web site

## www.embarq.com/retiree

### Employee Resource Center

## 888-722-4ERC
(888-722-4372)

### Toll-free
### 7 a.m. to 7 p.m. Central time Monday through Friday

EMBARQ will make every effort to ensure that this transition is as smooth as possible for you and your family.

# Summary of Material Modifications

This brochure is intended to be a modification to your summary plan description for the Embarq Retiree Medical Plan. EMBARQ intends to continue to provide coverage under the Retiree Medical Plan for retirees and dependents not eligible for Medicare; however, EMBARQ reserves the right to change or discontinue any or all benefits under the Plan at any time.

07 NV

Not VEBA par